**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2597

AMERICAN HUMANIST ASSOCIATION; STEVEN LOWE; FRED EDWORDS; BISHOP MCNEILL,

Plaintiffs – Appellants,

v.

MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION,

Defendant – Appellee,

THE AMERICAN LEGION; THE AMERICAN LEGION DEPARTMENT OF MARYLAND; THE AMERICAN LEGION COLMAR MANOR POST 131,

Intervenors/Defendants – Appellees,

--------------------------------

FREEDOM FROM RELIGION FOUNDATION; CENTER FOR INQUIRY,

Amici Supporting Appellant,

THE BECKETT FUND FOR RELIGIOUS LIBERTY; JOE MANCHIN; DOUG COLLINS; VICKY HARTZLER; JODY HICE; EVAN JENKINS; JIM JORDAN; MARK MEADOWS; ALEX MOONEY; STATE OF WEST VIRGINIA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS; STATE OF KENTUCKY; STATE OF LOUISIANA; STATE OF MICHIGAN; STATE OF MONTANA; STATE OF NEVADA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF RHODE ISLAND; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS; STATE OF UTAH; STATE OF VIRGINIA; STATE OF WISCONSIN,

Amici Supporting Appellee.

---

Appeal from the United States District Court of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:14-cv-00550-DKC)

---

ARGUED: December 7, 2016                      Decided: October 18, 2017

---

Before GREGORY, Chief Judge, and WYNN and THACKER, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Thacker wrote the opinion, which Judge Wynn joined. Chief Judge Gregory wrote an opinion concurring in part and dissenting in part.

---

**ARGUED:** Monica Lynn Miller**,** AMERICAN HUMANIST ASSOCIATION, Washington, D.C., for Appellants. Christopher John DiPompeo, JONES DAY, Washington, D.C.; William Charles Dickerson, MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION, Riverdale, Maryland, for Appellees. **ON BRIEF:** David A. Niose, AMERICAN HUMANIST ASSOCIATION, Washington, D.C.; Daniel P. Doty, LAW OFFICE OF DANIEL P. DOTY, P.A., Baltimore, Maryland, for Appellants. Adrian R. Gardner, Tracey A. Harvin, Elizabeth L. Adams, MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION, Riverdale, Maryland, for Appellee Maryland-National Capital Park and Planning Commission; Noel J. Francisco, JONES DAY, Washington, D.C.; Roger L. Byron, Kenneth A. Klukowski, FIRST LIBERTY, Plano, Texas, for Appellees The American Legion, The American Legion Department of Maryland, and The American Legion Colmar Manor Post 131. Patrick C. Elliott, FREEDOM FROM RELIGION FOUNDATION, Madison, Wisconsin, for Amici Freedom From Religion Foundation and Center For Inquiry. Eric C. Rassbach, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C.; Paul J. Zidlicky, SIDLEY AUSTIN LLP, Washington, D.C., for Amicus The Becket Fund for Religious Liberty. Charles J. Cooper, David H. Thompson, Howard C. Nielson, Jr., Haley N. Proctor, COOPER & KIRK, PLLC, Washington, D.C., for Amici Senator Joe Manchin and Representatives Doug Collins, Vicky Hartzler, Jody Hice, Evan Jenkins, Jim Jordan, Mark Meadows, and Alex Mooney. Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, Julie Marie Blake, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia; Steve

Marshall, Attorney General of Alabama, Montgomery, Alabama, for Amicus State of Alabama; Mark Brnovich, Attorney General of Arizona, Phoenix, Arizona, for Amicus State of Arizona; Leslie Rutledge, Attorney General of Arkansas, Little Rock, Arkansas, for Amicus State of Arkansas; Pamela Jo Bondi, Attorney General of Florida, Tallahassee, Florida, for Amicus State of Florida; Christopher M. Carr, Attorney General of Georgia, Atlanta, Georgia, for Amicus State of Georgia; Douglas S. Chin, Attorney General of Hawaii, Honolulu, Hawaii, for Amicus State of Hawaii; Lawrence G. Wasden, Attorney General of Idaho, Boise, Idaho, for Amicus State of Idaho; Curtis Hill, Attorney General of Indiana, Indianapolis, Indiana, for Amicus State of Indiana; Derek Schmidt, Attorney General of Kansas, Topeka, Kansas, for Amicus State of Kansas; Andy Beshear, Attorney General of Kentucky, Frankfort, Kentucky, for Amicus State of Kentucky; Jeff Landry, Attorney General of Louisiana, Baton Rouge, Louisiana, for Amicus State of Louisiana; Bill Schuette, Attorney General of Michigan, Lansing, Michigan, for Amicus State of Michigan; Timothy C. Fox, Attorney General of Montana, Helena, Montana, for Amicus State of Montana; Adam Paul Laxalt, Attorney General of Nevada, Carson City, Nevada, for Amicus State of Nevada; Wayne Stenehjem, Attorney General of North Dakota, Bismarck, North Dakota, for Amicus State of North Dakota; Michael DeWine, Attorney General of Ohio, Columbus, Ohio, for Amicus State of Ohio; E. Scott Pruitt, Attorney General of Oklahoma, Oklahoma City, Oklahoma, for Amicus State of Oklahoma; Peter F. Kilmartin, Attorney General of Rhode Island, Providence, Rhode Island, for Amicus State of Rhode Island; Alan Wilson, Attorney General of South Carolina, Columbia, South Carolina, for Amicus State of South Carolina; Marty J. Jackley, Attorney General of South Dakota, Pierre, South Dakota, for Amicus State of South Dakota; Ken Paxton, Attorney General of Texas, Austin, Texas, for Amicus State of Texas; Sean D. Reyes, Attorney General of Utah, Salt Lake City, Utah, for Amicus State of Utah; Mark R. Herring, Attorney General of Virginia, Richmond, Virginia, for Amicus Commonwealth of Virginia; Brad D. Schimel, Attorney General of Wisconsin, Madison, Wisconsin, for Amicus State of Wisconsin.

---

THACKER, Circuit Judge:

In this case we are called upon to decide whether the Establishment Clause is violated when a local government displays and maintains on public property a 40-foot tall Latin cross, established in memory of soldiers who died in World War I. The district court determined that such government action does not run afoul of the Establishment Clause because the cross has a secular purpose, it neither advances nor inhibits religion, and it does not have the primary effect of endorsing religion.

We disagree. The monument here has the primary effect of endorsing religion and excessively entangles the government in religion. The Latin cross is the core symbol of Christianity. And here, it is 40 feet tall; prominently displayed in the center of one of the busiest intersections in Prince George's County, Maryland; and maintained with thousands of dollars in government funds. Therefore, we hold that the purported war memorial breaches the "wall of separation between Church and State." *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947) (internal quotation marks omitted). Accordingly, we reverse and remand.

I.

A.

In 1918, some Prince George's County citizens started raising money to construct a giant cross, in addition to a previously established plaque, to honor 49 World War I soldiers from the county. The private organizers required each donor to sign a pledge sheet recognizing the existence of one god. It stated:

4

WE, THE CITIZENS OF MARYLAND, *TRUSTING IN GOD*, *THE SUPREME RULER* OF THE UNIVERSE, PLEDGE FAITH IN OUR BROTHERS WHO GAVE THEIR ALL IN THE WORLD WAR TO MAKE THE WORLD SAFE FOR DEMOCRACY. THEIR MORTAL BODIES HAVE TURNED TO DUST, BUT THEIR SPIRIT LIVES TO GUIDE US THROUGH LIFE IN THE WAY OF *GODLINESS*, JUSTICE, AND LIBERTY.

WITH OUR MOTTO, "*ONE GOD*, ONE COUNTRY AND ONE FLAG," WE CONTRIBUTE TO THIS MEMORIAL CROSS COMMEMORATING THE MEMORY OF THOSE WHO HAVE NOT DIED IN VAIN.

J.A. 1168 (emphasis supplied).[1] Local media described the proposed monument as a "mammoth cross, a likeness of the Cross of Calvary, as described in the Bible."[2] *Id.* at 1115. The private organizers held a groundbreaking ceremony on September 28, 1919, at which time the city of Bladensburg owned the land.

In 1922, the private organizers ran out of money and could not finish the project. So, the Snyder-Farmer Post of the American Legion (the "Post") assumed responsibility. At its initial fundraising drive, the Post had a Christian prayer-led invocation. Later that same year, on Memorial Day, the Post held memorial services around the unfinished monument, at which a Christian chaplain led prayer, and those in attendance sang the Christian hymn "Nearer My God to Thee." J.A. 2096. The Post ultimately completed

---

[1] Citations to the "J.A." or "Supp. J.A." refer to the Joint Appendix and Supplemental Joint Appendix, respectively, filed by the parties in this appeal.

[2] "Calvary" refers to the "proper name of the place where [Jesus] Christ was crucified." J.A. 289.

5

the monument in 1925 and had Christian prayer services at the dedication ceremony, during which only Christian chaplains took part. No other religions were represented.

Upon completion, the monument at issue stood four stories tall in the shape of a Latin cross located in the median of a three-way highway intersection in Bladensburg, Maryland (the "Cross"). Over the years, memorial services continued to occur on a regular basis at the Cross, and those services often included prayer at invocations and benedictions, and speaker-led prayers. Sunday worship services have at times been held at the Cross. Nothing in the record indicates that any of these services represented any faith other than Christianity.

On March 1, 1961, Appellee Maryland-National Capital Park and Planning Commission (the "Commission"), a state entity, obtained title to the Cross and the land on which it sits. According to the Commission, it acquired the Cross and land in part because of safety concerns arising from the placement of the Cross in the middle of a busy traffic median. Therefore, the Commission purports that it assumed responsibility to "maintain[], repair[], and otherwise car[e] for" the Cross. J.A. 2529. The Commission has since spent approximately $117,000 to maintain and repair the Cross, and in 2008, it set aside an additional $100,000 for renovations.

B.

Today, the 40-foot tall Cross is situated on a traffic island taking up one-third of an acre at the busy intersection of Maryland Route 450 and U.S. Route 1 in Bladensburg. The American Legion's symbol -- a small star inscribed with "U.S." -- is affixed near the top of the Cross, and an American flag flies in the vicinity of the Cross. The Cross sits

6

on a rectangular base, with each side inscribed with one of four words: "valor," "endurance," "courage," and "devotion." J.A. 1963 (capitalization omitted). Additionally, one side of the base contains a two-foot tall, nine-foot wide plaque listing the names of the 49 soldiers from Prince George's County whom the Cross memorializes, followed by a quote by President Woodrow Wilson.[3] However, the plaque is located on only one side of the base, which bushes have historically obscured.[4] Moreover, the plaque is badly weathered, rendering it largely illegible to passing motorists.

The Cross is part of a memorial park honoring veterans in Bladensburg (the "Veterans Memorial Park"). A small sign titled "Star-Spangled Banner National Historical Trail" is located on a walking path approximately 600 feet north of the Cross. This small sign -- which, like the plaque at the base of the Cross, is not readily visible from the highway -- serves as the only formal marker identifying the area as a memorial park by stating, "This crossroads has become a place for communities to commemorate their residents in service and in death." J.A. 1870. The other monuments in the memorial park area include a War of 1812 memorial, a World War II memorial, a Korean and Vietnam veterans memorial, and a September 11th memorial walkway. These surrounding monuments are each located at least 200 feet away from the Cross, with the

---

[3] "The right is more precious than peace. We shall fight for the things we have always carried nearest our hearts. To such a task we dedicate our lives." J.A. 1891.

[4] The bushes were removed in response to the filing of this action in an attempt to accommodate Appellants' requests. *See* Oral Argument at 26:50–27:00, *Am. Humanist Assoc. v. Maryland-Nat'l Capital Park & Planning Comm'n*, No. 15-2597, http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (Dec. 7, 2016).

War of 1812 memorial located one-half mile away. No other monument in the area is taller than ten feet, and there are no other religious symbols in the park.

Beyond the above description of the Cross and its placement in the park, various photographs from the record depicting the Cross are attached to this opinion. *See* J.A. 34 (image of the Cross before this case was filed), 1098 (closer image of the Cross), 1891 (image of the weathered plaque at the base of the Cross); Supp. J.A. 2 (overhead image of the Veterans Memorial Park).

## II.

Appellants Steven Lowe, Fred Edwords, and Bishop McNeill are non-Christian residents of Prince George's County who have faced multiple instances of unwelcome contact with the Cross. Specifically, as residents they have each regularly encountered the Cross while driving in the area, believe the display of the Cross amounts to governmental affiliation with Christianity, are offended by the prominent government display of the Cross, and wish to have no further contact with it. Per their complaint, they believe "a more fitting symbol of [veterans'] sacrifice would be a symbol of the Nation for which they fought and died, not a particular religion." J.A. 25. Appellant American Humanist Association ("AHA") is a nonprofit organization that advocates to uphold the founding principle of separation of church and state. AHA is suing on behalf of its members.[5]

---

[5] Where appropriate, Appellants AHA, Lowe, Edwords, and McNeill are collectively referred to as "Appellants."

8

As noted, Appellee Commission, a state entity, owns and maintains the Cross and the traffic island on which it stands. Appellees-Intervenors are the American Legion, the American Legion Department of Maryland, and the American Legion Colmar Manor Post 131 (collectively, "the Legion").[6] The Legion is a private organization focused on "Americanism" and the armed forces. J.A. 1469.

Appellants sued the Commission under 42 U.S.C. § 1983, alleging the Commission's display and maintenance of the Cross violates the Establishment Clause. Appellants seek a declaratory judgment that this conduct violates the Establishment Clause and Appellants' constitutional rights, an injunction enjoining the Commission from displaying the Cross on public property,[7] nominal damages, and attorney's fees and costs.

Appellants and Appellees filed cross-motions for summary judgment, and the district court granted summary judgment to Appellees. In doing so, the district court analyzed Appellants' claim pursuant to *Lemon v. Kurtzman*, 403 U.S. 602 (1971). It held the Commission owned the Cross and land for a legitimate secular reason, that is, to

---

[6] Where appropriate, the Commission and Legion are collectively referred to as "Appellees."

[7] Appellants later clarified their desired injunctive relief as removal or demolition of the Cross, or removal of the arms from the Cross "to form a non-religious slab or obelisk." J.A. 131.

maintain the highway median. The district court also identified a second secular purpose, which is to commemorate the 49 World War I soldiers from Prince George's County.[8]

The district court next determined that the Cross neither advanced nor inhibited religion because (1) the Cross has been primarily used for veterans' events; (2) crosses are generally regarded as commemorative symbols for World War I, at least overseas; (3) secular war memorials surround the Cross; and (4) the Cross has secular attributes, such as the Legion symbol on the face of the Cross. Finally, the district court concluded the Commission's display and maintenance of the Cross did not amount to excessive entanglement with religion because the Cross was not a governmental endorsement of religion. At bottom, the district court viewed the Commission's maintenance of the Cross as relating to traffic safety and veteran commemoration rather than religion. Appellants timely appealed.

III.

We review de novo a district court's grant of summary judgment. *See Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*, 794 F.3d 406, 411 (4th Cir. 2015). "In doing so, we apply the same legal standards as the district court, and view all facts in the light most favorable to the nonmoving party." *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 889 (4th Cir. 2015) (alterations and internal quotation marks omitted).

---

[8] Alternatively, the district court applied *Van Orden v. Perry*, 545 U.S. 677 (2005), and reached the same conclusion.

10

## IV.

Appellants contend that the Cross is a war memorial that favors Christians to the exclusion of all other religions. In response, Appellees frame Appellants' claim as promoting a strict rule that crosses on government property are per se unconstitutional, which they assert threatens memorials across the Nation.

## A.

As an initial matter, Appellees question whether Appellants have standing to bring this claim. They argue that Appellants have not "forgone any legal rights," such as "the right to drive on the public highways running through [the] Veterans Memorial Park" "to avoid contact with the memorial." Appellees' Br. 46 n.12. Appellees' standing argument lacks merit.

An Establishment Clause claim is justiciable even when plaintiffs claim noneconomic or intangible injury. *See Suhre v. Haywood Cty.*, 131 F.3d 1083, 1086 (4th Cir. 1997); *see also Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 582 (4th Cir.), *cert. granted*, 137 S. Ct. 2080 (2017). Specifically, in religious display cases, "unwelcome direct contact with a religious display that appears to be endorsed by the state" is a sufficient injury to satisfy the standing inquiry. *Suhre*, 131 F.3d at 1086.

The non-AHA Appellants have standing because they allege specific unwelcome direct contact with the Cross; that is, they have each regularly encountered the Cross as residents while driving in the area, the Commission caused such injury by displaying the Cross, and the relief sought -- enjoining the display of the Cross -- would redress their injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also ACLU v.*

11

*Rabun Cty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1108 (11th Cir. 1983) (determining one plaintiff had standing because a Latin cross was clearly visible from "the porch of his summer cabin" and from the roadway he used to reach the cabin). The AHA also has standing. An association has standing to sue on behalf of its members if they would have standing to sue on their own, the association seeks to protect interests germane to its purpose, and neither the claim asserted nor the relief requested requires its individual members to participate in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 429 (6th Cir. 2011). Here, the AHA has members in Prince George's County who have faced unwelcome contact with the Cross. These interests are germane to the AHA's purpose of maintaining the separation of church and state, and the claim and relief sought do not require individual participation. Appellants thus have standing to sue, and so we turn to the merits of this case.

## B.

The Establishment Clause provides, "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I. This clause thus guarantees religious liberty and equality to people of all faiths. *See Cty. of Allegheny v. ACLU*, 492 U.S. 573, 590 (1989), *abrogated on other grounds*, *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014).

We have generally analyzed Establishment Clause issues pursuant to *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See Buxton v. Kurtinitis*, 862 F.3d 423, 432 (4th Cir. 2017); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005);

*Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003). Per *Lemon*, to comply with the Establishment Clause, a challenged government display must (1) have a secular purpose; (2) not have a "principal or primary effect" that advances, inhibits, or endorses religion; and (3) not foster "an excessive entanglement between government and religion." *Lambeth*, 407 F.3d at 269–73 (internal quotation marks omitted); *see Lemon*, 403 U.S. at 612–13. "If a state action violates even one of these three prongs, that state action is unconstitutional." *Koenick v. Felton*, 190 F.3d 259, 265 (4th Cir. 1999) (citing *N.C. Civil Liberties Union Legal Found. v. Constangy*, 947 F.2d 1145, 1147 (4th Cir. 1991)); *see also Buxton*, 862 F.3d at 432.

However, Appellees dispute *Lemon*'s application here, arguing that, instead, the Supreme Court's holding in *Van Orden v. Perry*, 545 U.S. 677 (2005), controls. In *Van Orden*, the Court addressed whether a monument displaying the Ten Commandments on government property violated the Establishment Clause. *See* 545 U.S. at 681. The monument, located between the Texas Capitol and the Texas Supreme Court building, also displayed an eagle grasping the American flag, two Stars of David, Greek letters representing Christ, and an inscription indicating that a private organization donated the monument. *See id.* at 681–82. The monument stood six-feet high and three-and-a-half feet wide, and sat among "17 monuments and 21 historical markers commemorating the people, ideals, and events that compose Texan identity," *id.* at 681 (internal quotation marks omitted), such as monuments of the Heroes of the Alamo, the Texas National Guard, and the Texas Peace Officers, *see id.* at 681 n.1.

13

A plurality of the Court first decided the *Lemon* test is "not useful" in the "passive" monument context. *Van Orden*, 545 U.S. at 686. Rather, it examined the role and historical meanings of God and the Ten Commandments in our Nation's history. *See id.* at 686–91. The plurality first noted President George Washington's Thanksgiving Day Proclamation of 1789, which "directly attributed to the Supreme Being the foundations and successes of our young Nation," as an example of the "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.* at 686–87 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984)). It also recognized "the role of God in our Nation's heritage," pointing to other Ten Commandment displays in federal buildings, including the Supreme Court's own courtroom and the Library of Congress, which reinforced the secular connection between our Nation and the Ten Commandments. *See id.* at 687–89. Though the Ten Commandments have religious significance, the plurality noted that the Ten Commandments were given to Moses, who "was a lawgiver as well as a religious leader." *Id.* at 690. Finally, the plurality viewed the placement of the monument on the Texas State Capitol grounds as "far more passive" when compared to other display cases, especially because the petitioner in *Van Orden* "walked by the monument for a number of years" before suing. *Id.* at 691. Taking all of these considerations as a whole, the plurality concluded that the display in *Van Orden* did not violate the Establishment Clause.

Justice Breyer's concurrence, however, is controlling because it is the narrowest ground upholding the majority. *See Marks v. United States*, 430 U.S. 188, 193 (1977);

14

*A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002); *see also Card v. City of Everett*, 520 F.3d 1009, 1017 n.10 (9th Cir. 2008) (noting Justice Breyer's concurrence controls); *Staley v. Harris Co.*, 485 F.3d 305, 308 n.1 (5th Cir. 2007) (same); *Bronx Household of Faith v. Bd. of Educ.*, 650 F.3d 30, 49 (2d Cir. 2011) (same); *ACLU v. Grayson Co.*, 591 F.3d 837, 847 (6th Cir. 2010) (applying *Van Orden* and relying primarily on Justice Breyer's concurrence).  The concurrence explains that courts should remain faithful to the "basic purposes" of the Establishment Clause by examining, for example, the circumstances surrounding the monument's placement, its physical setting, and the length of time it remains unchallenged.  *Van Orden*, 545 U.S. at 698, 700–03 (Breyer, J., concurring).  In addition, however, Justice Breyer clarified that the *Lemon* test continues to act as a "useful guidepost[]" in Establishment Clause cases involving monuments with both secular and sectarian meanings.  *Id.* at 700.  The controlling *Van Orden* decision thus did not overrule *Lemon*; to the contrary, Justice Breyer actually recognized *Lemon* as a "more formal Establishment Clause test[]."  *Id.* at 703.  And this court has consistently applied *Lemon* in religious display cases.  *See, e.g.*, *Lambeth*, 507 F.3d at 268–69; *Smith v. Cty. of Albemarle*, 895 F.2d 953, 958 (4th Cir. 1990).  Thus, we see fit to apply *Lemon* in this case, with due consideration given to the *Van Orden* factors.

C.

For their part, Appellees assert *Van Orden* "dictates the outcome of this case," and there is no Establishment Clause violation because (1) the Commission's involvement relates to highway safety; (2) memorials surrounding the Cross commemorate veterans;

15

and (3) the Cross has stood unchallenged for 90 years. Appellees' Br. 21. But even under *Lemon*, Appellees contend that they prevail, particularly because the Cross's "content, setting, and history make clear to a reasonable objective observer that its primary effect is commemoration, not religious endorsement." *Id.* at 22. Therefore, Appellees argue that they prevail regardless of whether *Van Orden* or *Lemon* applies.

In support of their argument to the contrary, Appellants primarily rely on *Lemon*'s second prong -- that is, the "effect of advancing religion." Appellants highlight the Latin cross's inherent religious message, the history of religious activity involving the Cross, the Cross's size and prominence, and its limited secular features. Appellants alternatively assert that the Cross is unconstitutional under *Van Orden* because the Latin cross lacks any connection to our Nation's history, and the Cross's physical setting undermines the Establishment Clause.

As explained above, we analyze this case pursuant to the three-prong test in *Lemon* with due consideration given to the factors outlined in *Van Orden*, mindful that a violation of even one prong of *Lemon* results in a violation of the Establishment Clause.

1.

Secular Purpose

Demonstrating a legitimate secular purpose is "a fairly low hurdle." *Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir. 2001) (internal quotation marks omitted). Moreover, government action having "dual legitimate purposes" -- one secular and one sectarian -- "cannot run afoul of the first *Lemon* prong." *Id.* at 277.

16

The Commission has articulated legitimate secular purposes for displaying and maintaining the Cross that satisfy the first prong of *Lemon*. *See Lynch*, 465 U.S. at 680–81. The Commission obtained the Cross for a secular reason -- maintenance of safety near a busy highway intersection. The Commission also preserves the memorial to honor World War I soldiers. Government preservation of a significant war memorial is a legitimate secular purpose. *See Trunk v. City of San Diego*, 629 F.3d 1099, 1108 (9th Cir. 2011). Thus, the Commission has satisfied the first prong of *Lemon*.

2.

Effect

The second prong of *Lemon* requires this court to ask "whether a particular display, with religious content, would cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion." *Lambeth*, 407 F.3d at 271. A "reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious speech takes place." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001) (alterations omitted) (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779–80 (1995) (O'Connor, J., concurring)). "Put differently, the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval of religion." *Mellen*, 327 F.3d at 374 (alterations and internal quotation marks omitted). This second prong therefore requires a detailed factual analysis of the Cross, including its meaning, history, and secularizing elements,

and, where relevant, we consider the appropriate factors under *Van Orden*. *See Trunk*, 629 F.3d at 1110.

a.

Meaning of the Latin Cross

The Latin cross is the "preeminent symbol of Christianity." *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004) (internal quotation marks omitted); *see Robinson v. City of Edmond*, 68 F.3d 1226, 1232 (10th Cir. 1995); *Gonzales v. N. Twp. of Lake Cty.*, 4 F.3d 1412, 1418 (7th Cir. 1993); *Murray v. City of Austin*, 947 F.2d 147, 149 (5th Cir. 1991); *ACLU v. Rabun Cty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1110 (11th Cir. 1983). Indeed, the Latin cross is "exclusively a Christian symbol, and not a symbol of any other religion." *Trunk*, 629 F.3d at 1111 (internal quotation marks omitted); *see Buono*, 371 F.3d at 545; *Gonzales*, 4 F.3d at 1418 ("[W]e are masters of the obvious, and we know that the crucifix is a Christian symbol."). Notwithstanding the Latin cross's inherent religious meaning, the district court concluded that it is also a symbol of World War I, particularly overseas. Specifically, the district court concluded that the Cross at issue here evokes the image of white crosses on foreign battle fields. For this proposition, it cites the Legion's expert witness report, which states that "the symbolism of the cross is that of individual loss of life, not of the Resurrection [of Jesus Christ]." J.A. 1898.

While the Latin cross may generally serve as a symbol of death and memorialization, it only holds value as a symbol of death and resurrection *because* of its affiliation with the crucifixion of Jesus Christ. *See Carpenter v. City and Cty. of San Francisco*, 93 F.3d 627, 630 (9th Cir. 1996) ("The Latin cross is the preeminent symbol

18

of many Christian religions and represents with relative clarity and simplicity the Christian message of the crucifixion and resurrection of Jesus Christ, a doctrine at the heart of Christianity" (internal quotation marks omitted)); *ACLU v. City of St. Charles*, 794 F.2d 265, 273 (7th Cir. 1986) ("It is the principal symbol of the Christian religion, recalling the crucifixion of Jesus Christ and the redeeming benefits of his passion and death" (internal quotation marks omitted)). One simply cannot ignore the fact that for thousands of years the Latin cross has represented Christianity. Even in the memorial context, a Latin cross serves not simply as a generic symbol of death, but rather a Christian symbol of the death of Jesus Christ.[9] Further, even if other countries may identify the Latin cross as a commemorative symbol of World War I, that acknowledgment does not dictate our analysis. Indeed, crosses used on World War I battlefields were *individual* -- rather than universal -- memorials to the lives of Christian soldiers.[10] And this Nation, unlike others, maintains a clearly defined wall between

---

[9] The argument could be made that to hold that the Latin cross symbolizes anything other than Christianity may be deemed offensive to Christians. The Latin cross "reminds Christians of Christ's sacrifice for His people," and "it is unequivocally a symbol of the Christian faith." *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1022 (10th Cir. 2008).

[10] The poppy has actually been known as a universal symbol for commemorating World War I. *See Trunk*, 629 F.3d at 1113; Eang L. Ngov, *Selling Land and Religion*, 61 U. Kan. L. Rev. 1, 28 (2012) ("The poppy, as depicted in the famous poem In Flanders Fields, not the cross, became the universal symbol in the United States and abroad for the foreign wars" (footnotes omitted)); *The Cambridge Encyclopedia* 877 (6th ed. 2006) ("Red poppies, which grew wild in the fields of Flanders, are used in November as a symbol of remembrance of those who died in the two World Wars"); *see generally* H.R. Rep. No. 80-2071 (discussing the use of the poppy to memorialize World War I and reporting favorably on commemorative stamps depicting the poppy); Ryan Valentin, *Milk* (Continued)

church and state that "must be kept high and impregnable." *Everson v. Bd. of Educ.*, 330 U.S. 1, 18 (1947). Thus, the manner in which other countries view the Latin cross is of no moment.

Further, a Latin cross differs from other religious monuments, such as the Ten Commandments or the motto "In God We Trust." Those symbols are well known as being tied to our Nation's history and government, and courts have thus upheld their public display. *See, e.g.*, *Van Orden*, 545 U.S. at 688 (noting the secular role of the Ten Commandments in American history); *Lambeth*, 407 F.3d at 271–72 (acknowledging the ties between American history and the motto "In God We Trust"). Appellees have not sufficiently demonstrated that the Latin cross has a similar connection.

b.

<u>History of the Cross</u>

Though the history of the Latin cross favors Appellants, the history of the particular Cross before us does not clearly support one party over the other. On the one hand, the initial donors to the memorial fund signed a pledge professing a belief in God, and the Cross has been the scene of Christian activities, such as Sunday worship services and group prayer at invocations and benedictions. On the other hand, private organizations raised money to erect the Cross, it has a scattered history of religious use,

---

*and Other Intoxicating Choices: Official State Symbol Adoption*, 41 N. Ky. L. Rev. 1, 5–6 (2014); Jennifer Iles, *In Remembrance: The Flanders Poppy*, 13 Mortality 201 (2008) (discussing the history of the poppy and its status as a symbol of remembrance).

and it has primarily hosted veteran-focused ceremonies. Thus, when viewed through the lens of not only *Lemon*, but also of *Van Orden*, the circumstances surrounding the Cross's placement admittedly point to a semisecular history. *See Van Orden*, 545 U.S. at 701.

It is also true that the Cross has stood unchallenged for 90 years, which Appellees argue reinforces its secular effect. *See Van Orden*, 545 U.S. at 702. But that argument is too simplistic. In this case, it cannot be said that "the longer the violation, the less violative it becomes." *Gonzales*, 4 F.3d at 1422 (rejecting the argument that nearly 40 years without challenging a crucifix reinforced its secular effect).[11] Perhaps the longer a violation persists, the greater the affront to those offended. The Cross's history therefore does not definitively aid either side in the analysis.

---

[11] Of note, a person who dared bring a challenge to the Cross for much of those 90 years would have faced possible rebuke. For example, atheists were forbidden from holding public office until the Supreme Court's intervention in the 1960's. In 1959, the Governor of Maryland appointed Roy Torcaso as a Notary Public, but the Secretary of State of Maryland refused to issue the commission because Torcaso, an atheist, would not declare a belief in the existence of god. *See* Appellant's Br. 4; *Torcaso v. Watkins*, 367 U.S. 488 (1961). The Maryland Constitution provides, "No religious test ought to be required as a qualification for any office of profit or trust in this state other than a declaration of belief in the existence of God." The Supreme Court deemed the clause unconstitutional declaring that Maryland had "set[] up a religious test which was designed to and, if valid, does bar every person who refuses to declare a belief in God from a public office of profit or trust in Maryland." *Torcaso*, 367 U.S. at 489 (internal quotation marks omitted). More than 50 years later, the constitution still contains the offending provision. *See* Md. Const. Decl. of Rts. art. 37.

c.

Secular Elements

Admittedly, the Cross contains a few secular elements. As support for their position, Appellees point to the plaque at the base of the Cross that contains the names of the 49 soldiers from Prince George's County whose lives were lost in World War I; the Legion symbol; the words "valor," "endurance," "courage," and "devotion" inscribed on its base; an American flag flying in its vicinity; and its location in the Veterans Memorial Park. Appellees maintain that the plaque and symbols diminish any government endorsement of religion.

But the sectarian elements easily overwhelm the secular ones. The Cross is by far the most prominent monument in the area, conspicuously displayed at a busy intersection, standing four stories tall, and overshadowing the other monuments, the tallest of which is only ten feet tall and located approximately 200 feet from the Cross. The other monuments composing the Veterans Memorial Park are anywhere from 200 feet away to a half-mile away. The immense size and prominence of the Cross necessarily "evokes a message of aggrandizement and universalization of religion, and not the message of individual memorialization and remembrance that is presented by a field of gravestones." *Trunk*, 629 F.3d at 1116 n.18 (citation omitted).

In addition, the Cross is not located in an area where one could easily park, walk to the Cross, and examine the plaque.[12] Rather, the Cross is located in a high-traffic area, and passers-by would likely be unable to read the plaque, particularly given its location on only one side of the Cross,[13] and the fact that both the plaque and the American Legion symbol are badly weathered, not to mention that the American Legion symbol is small in comparison to the overall size of the Cross. We also cannot ignore the American Legion's affiliation with Christianity, as gleaned from its prayer manuals and the "Four Pillars of the American Legion." J.A. 1469.[14] And, when we consider the physical setting of the Cross pursuant to *Van Orden*, Appellees' arguments are equally unavailing. *See* 545 U.S. at 702. The Cross's location on public property at a busy traffic intersection, the small size and scattered locations of the surrounding monuments, plus

---

[12] Although there may be parking available in the vicinity of the Cross, as well as a walkway to the Cross, realistically, the general public may not easily or readily access the Cross. In fact, Appellees admitted at oral argument that pedestrians attending ceremonies held at the Cross accessed the site primarily with help from police officers guiding pedestrians through the intersection and highway. *See* Oral Argument at 25:00–26:30, *Am. Humanist Assoc. v. Maryland-Nat'l Capital Park & Planning Comm'n*, No. 15-2597, http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (Dec. 7, 2016). And, after all, the primary reason the Commission took over the maintenance of the Cross was for safety reasons, given its location in the middle of a busy highway intersection.

[13] The plaque's location on one side of the Cross makes it visible, if at all, only to those traveling on a small portion of the busy highway. *See* J.A. 1891 (photograph of the weathered plaque); *see also* Appendix (attached).

[14] For example, to the exclusion of other religions, each Legion chapter has a chaplain, and the Legion has a Christian prayer manual that is used at meetings, invocations, and benedictions. Further, pursuant to the "Four Pillars of the American Legion," the Legion opposes attacks on "patriotic" values. J.A. 1469. Such attacks include prayer being "removed from schools," "[r]eferences to God [being] challenged," and attacks on the "institution of marriage." *Id.* at 1469–70.

23

the fact that bushes have obscured the plaque for much of its history, *see, e.g.*, J.A. 34 (photograph of the Cross before this case was filed), all point to a violative display. *See Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1121 (10th Cir. 2010) ("The fact that the [12-foot tall] cross includes biographical information about [a] fallen trooper does not diminish the governmental message endorsing Christianity. This is especially true because a motorist driving by one of the memorial crosses at 55-plus miles per hour may not notice, and certainly would not focus on, the biographical information.").

Thus, we conclude that the historical meaning and physical setting of the Cross overshadows its secular elements. Other courts presented with similar situations have concluded likewise. *See, e.g.*, *Trunk*, 629 F.3d at 1123 (concluding a 43-foot Latin cross, though purporting to serve as a war memorial, overshadowed its secular aspects, which included a plaque and 2,100 commemorative bricks); *Gonzales*, 4 F.3d at 1422–23 (determining that an 18-foot wooden crucifix advanced religion, despite containing a plaque dedicating it to veterans, because the plaque was obscured); *Smith*, 895 F.2d at 958 (concluding a crèche[15] on government property violated the Establishment Clause in part because a plaque stating its private sponsorship was "relatively small . . . in relation to the whole" display, thus "mitigat[ing] [the plaque's] value").

According to the dissent, our analysis bases the unconstitutionality of the Cross "predominantly on the size of the cross," without fairly weighing its "appearance,

---

[15] A crèche is "a visual representation of the scene in the manger in Bethlehem shortly after the birth of Jesus, as described in the Gospels of Luke and Matthew." *Cty. of Allegheny*, 492 U.S. at 580 (footnote omitted).

context, and factual background." *Post* at 42 (emphasis omitted). This is not accurate. Although we are of the opinion that the size of a religious display does matter, we have also carefully considered the other factors required by *Lemon* and *Van Orden*. *See* Part IV.C.2.a (analyzing context and meaning); Part IV.C.2.b (factual background and history); Part IV.C.2.c (appearance). We are confident that we have fully complied with our "constitutional directive." *Post* at 42.

d.

Reasonable Observer

Considering the factors above, we conclude that a reasonable observer would fairly understand the Cross to have the primary effect of endorsing religion. We do not disagree with the dissent's characterization of the "reasonable observer" as someone who is not just an "ordinary individual" but "aware of the history and context of the community and forum in which the religious display appears." *Post* at 43–44 (internal quotation marks omitted); *see Lambeth*, 407 F.3d at 271–72 (quoting *Good News Club*, 533 U.S. at 119 (citation omitted)). In fact, Appellees at oral argument reaffirmed that the reasonable observer is aware of the entire context and history of the Cross, spanning from its origin to the present. *See* Oral Argument at 18:04–19:00, *Am. Humanist Assoc. v. Maryland-Nat'l Capital Park & Planning Comm'n*, No. 15-2597, http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (Dec. 7, 2016).

Accordingly, a reasonable observer would know that the Cross is dedicated to 49 World War I veterans and that veteran services occur at the Cross. But, more importantly, a reasonable observer would also know that the private organizers pledged

25

devotion to faith in God, and that same observer knows that Christian-only religious activities have taken place at the Cross. No party has come forward with any evidence to the contrary. Although the reasonable observer may recognize that the Cross is located in the Veterans Memorial Park, such reasonable observer also could not help but note that the Cross is the most prominent monument in the Park and the only one displaying a religious symbol. Further, the reasonable observer would know that a Latin cross generally represents Christianity. These factors collectively weigh in favor of concluding that the Cross endorses Christianity -- not only above all other faiths, but also to their exclusion.

The Commission and supporting amici equate the Cross to the crosses in Arlington National Cemetery and similar locations. They raise concerns that siding with Appellants here would jeopardize other memorials across the Nation displaying crosses, laying waste to such memorials nationwide. Any such concern is misplaced. Establishment Clause cases are fact-specific, and our decision is confined to the unique facts at hand. *See McCreary Cty. v. ACLU*, 545 U.S. 844, 867–68 (2005) (recognizing the relevant inquiry is based on the specific facts before the Court); *Van Orden*, 545 U.S. at 700 (acknowledging the "fact-intensive" nature of religious display cases); *Card*, 520 F.3d at 1014; *Staley*, 485 F.3d at 309; *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222 (10th Cir. 2005).

In any event, Arlington National Cemetery is a designated area for commemorating and memorializing veterans who have passed away.[16] The crosses there are much smaller than the 40-foot tall monolith at issue here. And, significantly, Arlington National Cemetery displays diverse religious symbols, both as monuments and on individual headstones.[17] Contrast that with the Cross here. There are no other religious symbols present on the Cross or in the entirety of the Veterans Memorial Park. Christianity is singularly -- and overwhelmingly -- represented. Therefore, the second prong of *Lemon* is violated.

3.

Excessive Entanglement

We turn now to the third prong of the *Lemon* test -- whether the government display creates "an excessive entanglement between government and religion." *Lambeth*, 407 F.3d at 272–73 (internal quotation marks omitted). Excessive entanglement with religion "is a question of kind and degree." *Lynch*, 465 U.S. at 684. Such entanglement may include "pervasive monitoring or other maintenance by public authorities." *Lambeth*, 407 F.3d at 273 (citations omitted). Spending public funds, though a factor in the analysis, is not necessary for a plaintiff to satisfy the entanglement prong. *See*

---

[16] It must be made clear that we are not deciding or passing judgment on the constitutionality of Arlington National Cemetery's display of Latin crosses. Rather, we are merely distinguishing the facts at hand from those displayed at other places of commemoration.

[17] Images of such headstones are attached in the appendix.

*Constangy*, 947 F.2d at 1152. Indeed, excessive entanglement may lie simply where the government's entanglement has the effect of advancing or inhibiting religion. *See Agostini v. Felton*, 521 U.S. 203, 232–33 (1997).

We hold there is excessive religious entanglement in this case for two reasons. First, the Commission owns and maintains the Cross, which is displayed on government property. The Commission has spent at least $117,000 to maintain the Cross and has set aside an additional $100,000 for restoration. Other cases holding that displays violate the Establishment Clause have involved de minimis government spending, if any. *See Bowen v. Kendrick*, 487 U.S. 589, 623 (1988) (O'Connor, J., concurring) ("[A]ny use of public funds to promote religious doctrines violates the Establishment Clause." (emphasis omitted)).[18] Second, displaying the Cross, particularly given its size, history, and context, amounts to excessive entanglement because the Commission is displaying the hallmark symbol of Christianity in a manner that dominates its surroundings and not only overwhelms all other monuments at the park, but also excludes all other religious tenets. The display aggrandizes the Latin cross in a manner that says to any reasonable observer that the Commission either places Christianity above other faiths, views being American and Christian as one in the same, or both. Therefore, the third prong of *Lemon* is also violated. We note, however, that because the Cross is unconstitutional under the

---

[18] The dissent's view to the contrary is only based on its differing views of the Cross -- as a "historical monument" rather than promotion of a religious doctrine in the form of a religious symbol. *Post* at 48. For the reasons explained *supra*, the Cross embodies promotion of a religious doctrine, Christianity, and therefore, Justice O'Connor's statement is directly applicable.

effect prong, the excessive entanglement prong here merely provides an alternative indicator of the Cross's unconstitutionality.

4.

Conclusion

The Commission's display of the Cross fails the second and third prongs of *Lemon*, and the *Van Orden* factors are unsupportive of Appellees' position in this case. The display and maintenance of the Cross violates the Establishment Clause.

V.

For the foregoing reasons, the judgment of the district court is

*REVERSED AND REMANDED*. [19]

---

[19] Upon remand, the parties should note that this opinion does not presuppose any particular result (i.e., removing the arms or razing the Cross entirely); rather, the parties are free to explore alternative arrangements that would not offend the Constitution.



(J.A. 34) [20]

---

[20] A photograph of the Cross prior to the filing of this case.



(J.A. 1098) [21]

---

[21] A photograph of the Cross from 2014 prior to the filing of this case.



(J.A. 1891) [22]



(Supp. J.A. 2) [23]

---

[22] A photograph of the weathered plaque located on the base of the Cross.

[23] An overhead image of the Veterans Memorial Park. The Cross is located slightly to the left of center, titled "WWI Memorial."



As referenced in footnote 17, images of headstones in Arlington National Cemetery adorned with diverse religious symbols, identified from top left to bottom right: Soka Gakkai, Christianity, Buddhism, Wicca, Islam, Catholicism, United Church of Christ, Judaism, and Atheism. Arlington National Cemetery, https://pbs.twimg.com/media/CUa2t63VEAEoIfE.jpg.

GREGORY, Chief Judge, concurring in part and dissenting in part:

I agree with the majority's holding that Appellants have standing under 42 U.S.C. § 1983 to bring this action for a violation of the Establishment Clause. But I disagree with the majority's ultimate conclusion that the display and maintenance of the war memorial in this case violates the Establishment Clause. I therefore respectfully dissent in part.

I.

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. To properly understand and apply the Establishment Clause, it must be viewed "in the light of its history and the evils it was designed forever to suppress." *Everson v. Bd. of Educ.*, 330 U.S. 1, 14–15 (1947). The early colonization of America was a time marked with religious persecution. Immigrating settlers fled religious suppression in Europe only to be met with similar treatment in America. "[M]en and women of varied faiths who happened to be in a minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated." *Id.* at 10. Those regarded as nonconformists were required "to support government-sponsored churches whose ministers preached inflammatory sermons designed to strengthen and consolidate the established faith by generating a burning hatred against dissenters." *Id.*

The Establishment Clause was intended to combat the practice of "compel[ling] individuals] to support and attend government favored churches." *Id.* at 8; *accord Myers*

34

*v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 402 (4th Cir. 2005). The Clause's historical setting reveals that "[i]ts first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion." *Engel v. Vitale*, 370 U.S. 421, 431 (1962). The realization of its goal meant that the government must "'neither engage in nor compel religious practices,' that it must 'effect no favoritism among sects or between religion and nonreligion,' and that it must 'work deterrence of no religious belief.'" *Van Orden v. Perry*, 545 U.S. 677, 698 (2005) (Breyer, J., concurring) (plurality opinion) (quoting *Abington School Dist. v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J., concurring)).

But the Clause does not require the government "to purge from the public sphere" any reference to religion. *Id.* at 699. "Such absolutism is not only inconsistent with our national traditions, but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid." *Id.* (citations omitted). While neutrality may be the "touchstone" of the Establishment Clause, it more so serves as a "sense of direction" than a determinative test. *McCreary Cty. v. Am. Civil Liberties Union*, 454 U.S. 844 (2005). We cannot view neutrality as some sort of "brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious." *Schempp*, 374 U.S. at 306 (Goldberg, J., concurring). Thus, in reviewing the challenged war memorial, this Court must seek general rather than absolute neutrality. We do so by engaging in the three-factor analysis delineated in *Lemon v. Kurtzman* (the "*Lemon* test"), which requires that the memorial have a secular purpose; have a principal or primary effect that neither advances, inhibits, nor endorses religion; and not foster "an excessive government

35

entanglement with religion." 403 U.S. 602, 612–13 (1971). The memorial "must satisfy each of the *Lemon* test's three criteria" to pass constitutional muster. *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 269 (4th Cir. 2005) (citing *Mellen v. Bunting*, 327 F.3d 355, 367 (4th Cir. 2003)).

## II.

## A.

I will briefly reiterate the operative facts. In Bladensburg, Maryland, in a median at the intersection of Maryland Route 450 and U.S. Route 1, stands a war memorial consisting of a forty-foot-tall concrete Latin cross (the "Memorial"). The Memorial and the median are currently owned by Appellee Maryland-National Capital Park and Planning Commission (the "Commission"). Intervenor-Appellee American Legion's symbol is displayed in the middle of the cross on both faces. The cross sits on a base and includes a plaque that lists the names of the forty-nine Prince George's County residents who died in World War I. J.A. 1891. The plaque also states, "THIS MEMORIAL CROSS DEDICATED TO THE HEROES OF PRINCE GEORGE'S COUNTY MARYLAND WHO LOST THEIR LIVES IN THE GREAT WAR FOR THE LIBERTY OF THE WORLD," and includes a quotation from President Woodrow Wilson. *Id.* Also, each face of the base is inscribed with one of four words: "VALOR," "ENDURANCE," "COURAGE," and "DEVOTION." J.A. 1963.

In 1918, a group of private citizens led the charge to construct and finance the Memorial. The donors signed a pledge stating that they, "trusting in God, the Supreme

36

Ruler of the universe," pledged their faith in the forty-nine war dead, whose spirits guided them "through life in the way of godliness, justice, and liberty." J.A. 1168. The group also circulated a fundraising flyer stating,

> Here, those who come to the Nation's Capital to view the wonders of its architecture and the sacred places where their laws are made and administered may, before this Cross, rededicate[] themselves to the principles of their fathers and renew the fires of patriotism and loyalty to the nation which prompted these young men to rally to the defense of the right. And here the friends and loved ones of those who were in the great conflict will pass daily over a highway memorializing their boys who made the supreme sacrifice.

J.A. 2303.

A groundbreaking ceremony was held for the Memorial and for Maryland Route 450 (then known as the National Defense Highway) in late 1919. Several local officials spoke about the fallen soldiers and how both the Memorial and highway would commemorate their bravery and sacrifice. But the private group ultimately failed to raise enough money to construct the Memorial and abandoned the project. The local post of the American Legion, a congressionally chartered veterans service organization, then took up the task and completed the Memorial on July 25, 1925. That day, the post held a ceremony which included multiple speeches regarding the Memorial's representation of the men who died fighting for this country and an invocation and benediction delivered by local clergymen.

Over time, additional monuments honoring veterans were built near the Memorial (known as the "Veterans Memorial Park"). Because the Memorial sits in the middle of a median and is separated by a busy highway intersection, the closest additional monument

37

is about 200 feet away. Since the Memorial's completion, numerous events have been hosted there to celebrate Memorial Day, Veterans Day, the Fourth of July, and the remembrance of September 11th. These ceremonies usually include an invocation and benediction, but the record demonstrates that only three Sunday religious services were held at the Memorial—all of which occurred in August 1931. J.A. 347.

Due to increasing traffic on the highway surrounding it, the Commission acquired the Memorial and the median where it is located from the American Legion in March 1961. Since that time, the Commission has spent approximately $117,000 to maintain and repair the Memorial. In 2008, it set aside an additional $100,000 for renovations, of which only $5,000 has been spent as of 2015. J.A. 562–65. On February 25, 2014, more than fifty years after the Memorial passed into state ownership, Appellants initiated this suit against the Commission under 42 U.S.C. § 1983 alleging a violation of the Establishment Clause.

## B.

By concluding that the Memorial violates the Establishment Clause, the majority employed the *Lemon* test "with due consideration given to the factors outlined in *Van Orden*." Maj. Op. at 16. In *Van Orden*, a plurality of the Supreme Court determined that the *Lemon* test was not useful when evaluating a "passive monument." 545 U.S. at 686. Instead, the Court's analysis was "driven both by the nature of the monument and by our Nation's history." *Id.* As the majority recognizes, Justice Breyer's concurrence is the controlling opinion in *Van Orden*. Maj. Op. at 14. Justice Breyer states that the Court's Establishment Clause tests, such as *Lemon*, cannot readily explain the Clause's tolerance

38

of religious activities in "borderline cases," as there is "no single mechanical formula that can accurately draw the constitutional line in every case." *Van Orden*, 454 U.S. at 699–700 (Breyer, J., concurring). "If the relation between government and religion is one of separation, but not of mutual hostility and suspicion, one will inevitably find difficult borderline cases." *Id.* at 700. Instead of applying *Lemon* to the challenged Ten Commandments display, Justice Breyer exercised his "legal judgment" and evaluated the context of the display and how the undeniably religious text of the Commandments was used. *Id.* at 700–04. His concurrence, however, also noted that *Lemon* provides a "useful guidepost[]—and might well lead to the same result"—for "no exact formula can dictate a resolution to such fact-intensive cases." *Id.* at 700.

Relying on *Lemon*, and drawing guidance from *Van Orden*, the majority determined that the Commission articulated a legitimate secular purpose for displaying the Memorial. Nevertheless, the majority concluded that the Memorial failed *Lemon*'s second and third factors, finding that a reasonable observer would conclude that the Memorial has the primary effect of endorsing religion and the Commission's maintenance of the Memorial constitutes excessive entanglement with religion. In my view, the majority misapplies *Lemon* and *Van Orden* to the extent that it subordinates the Memorial's secular history and elements while focusing on the obvious religious nature of Latin crosses themselves; constructs a reasonable observer who ignores certain elements of the Memorial and reaches unreasonable conclusions; and confuses maintenance of a highway median and monument in a state park with excessive religious entanglement.

III.

Because Appellants do not challenge the district court's finding that the Commission has demonstrated a secular purpose for displaying and maintaining the Memorial (the first *Lemon* factor), I will discuss in turn the majority's evaluation of the second and third *Lemon* factors—whether the Memorial has the primary effect of advancing or inhibiting religion and whether the government is excessively entangled with religion.

A.

Under *Lemon*'s second factor, we must determine "whether a particular display, with religious content, would cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion." *Lambeth*, 407 F.3d at 271. This reasonable observer inquiry "requires the hypothetical construct of an objective observer who knows all of the pertinent facts and circumstances surrounding the [display] and its placement." *Salazar v. Buono*, 559 U.S. 700, 721 (2010) (plurality opinion). We should not ask "whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think the State endorses religion." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring) (internal quotation marks omitted). Instead, we must determine "whether . . . the display's principal or primary effect is to advance or inhibit religion; or, put differently, whether an informed, reasonable observer would view the display as an endorsement of religion." *Lambeth*, 407 F.3d at 272.

40

It is undeniable that the Latin cross is the "preeminent symbol of Christianity." Maj. Op. at 18. But we must be careful not to "focus exclusively on the religious component" of a display, as that "would inevitably lead to its invalidation under the Establishment Clause." *Lambeth*, 407 F.3d at 271 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984)). Indeed, the Supreme Court "has consistently concluded that displays with religious content—but also with a legitimate secular use—may be permissible under the Establishment Clause." *Id.* (citing *Cty. of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 579 (1989)). A reasonable observer would be aware that the cross is "not merely a reaffirmation of Christian beliefs," for it is "often used to honor and respect those whose heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people." *Buono*, 559 U.S. at 721.

Despite the religious nature of the Latin cross, a reasonable observer must also adequately consider the Memorial's physical setting, history, and usage. The Memorial was created to commemorate the forty-nine soldiers who lost their lives in World War I, as explicitly stated on the plaque attached to its base. *See* J.A. 1891 ("THIS MEMORIAL CROSS DEDICATED TO THE HEROES OF PRINCE GEORGE'S COUNTY MARYLAND WHO LOST THEIR LIVES IN THE GREAT WAR FOR THE LIBERTY OF THE WORLD."). The plaque also includes a quotation from President Woodrow Wilson stating, "The right is more precious than peace. We shall fight for the things we have always carried nearest our hearts. To such a task we dedicate our lives." *Id.* Each face of the cross includes the American Legion seal and each face of the base is inscribed with one of four words: "VALOR," "ENDURANCE," "COURAGE," and

41

"DEVOTION." J.A. 1963. The Memorial has functioned as a war memorial for its entire history, and it sits among other secular monuments in Veterans Memorial Park, though it is separated from the other monuments by intersecting highways.

The majority concludes that the size of the Latin cross making up the Memorial overwhelms these secular elements. In the majority's view, the Memorial is unconstitutional based predominantly on the size of the cross, and neither its secular features nor history could overcome the presumption. But such a conclusion is contrary to our constitutional directive. We must fairly weigh the appearance, context, *and* factual background of the challenged display when deciding the constitutional question. *See Lynch*, 465 U.S. at 679–80; *Cty. of Allegheny*, 492 U.S. at 598–600. Although a reasonable observer would properly notice the Memorial's large size, she would also take into account the plaque, the American Legion symbol, the four-word inscription, its ninety-year history as a war memorial, and its presence within a vast state park dedicated to veterans of other wars. Would the majority's version of a reasonable observer be satisfied and better equipped to evaluate the Memorial's history and context if the cross were smaller? Perhaps if it were the same size as the other monuments in the park? Though Establishment Clause cases require a fact-intensive analysis, we must bear in mind our responsibility to provide the government and public with notice of actions that violate the Constitution. What guiding principle can be gleaned from the majority's focus on the cross's size? Understandably, the majority's decision would lead to per se findings that all large crosses are unconstitutional despite any amount of secular history and context, in contravention of Establishment Clause jurisprudence.

42

The majority also makes much of the Memorial's isolation from the other monuments in Veterans Memorial Park, as it sits in the median of a now busy highway, making it difficult to access. But a reasonable observer would note that the Memorial was placed there as part of the concurrent creation of the National Defense Highway to commemorate the soldiers of World War I, not as a means of endorsing religion. And, though Veterans Memorial Park does not include any other religious symbols as memorials, there is no evidence that the state formally foreclosed the possibility of erecting any other religious symbol. Also, the reasonable observer would note that the Memorial's physical setting does not lend itself to any religious worship. *Van Orden*, 545 U.S. at 702 (stating that religious display's location in large park containing other monuments suggested "little or nothing sacred," as it illustrated residents' historical ideals and "did not readily lend itself to meditation or any other religious activity").

Additionally, due to the Memorial's location, the majority explains that a reasonable observer would not be able to easily examine the Memorial's secular elements. Maj. Op. at 23. This is because the Memorial "is located in a high-traffic area and passers-by would likely be unable to read the plaque," which is small and badly weathered. *Id.* at 23. However, the reasonable observer's knowledge is not "limited to the information gleaned simply from viewing the challenged display." *Pinette*, 515 U.S. at 780–81 (O'Connor, J., concurring). That the average person in the community may have difficulty viewing all of the secular elements of the Memorial while stuck in traffic or driving at high speeds is of no consequence, for the reasonable observer "is not to be identified with any ordinary individual, . . . but is rather a personification of a community

43

ideal of reasonable behavior" who is "deemed aware of the history and context of the community and forum in which the religious display appears." *Id.* at 779–80 (internal quotation marks and citations omitted). Thus, the reasonable observer's ability to consider these secular elements is by no means diminished.

Further, quoting *Trunk v. City of San Diego*, 629 F.3d 1099, 1116 n.18 (9th Cir. 2011), the majority states that the large size and isolation of the Memorial "evokes a message of aggrandizement and universalization of religion, and not the message of individual memorialization and remembrance that is presented by a field of gravestones." Maj. Op. at 22. In *Trunk*, the Ninth Circuit considered a forty-three-foot free-standing cross and veterans memorial erected in a state park. 629 F.3d at 1101. The court evaluated the history of the Latin cross generally, its use as a war memorial, the history of the particular war memorial at issue, and its physical setting. *Id.* at 1102–05, 1110–24. The cross in *Trunk* had no secular elements; instead, it was unadorned and without any physical indication that it was a war memorial until after litigation was initiated to remove it. *Id.* at 1101–02; *see also Smith v. Cty. of Albemarle*, 895 F.2d 953, 958 (4th Cir. 1990) (concluding that crèche, unassociated with any secular symbols, prominently displayed in front of government building, and unaccompanied by any other religious or nonreligious displays, conveyed message of governmental endorsement of religion). The court concluded that a reasonable observer would perceive the presence of the cross as the federal government's endorsement of Christianity, due in part to its long history of serving as a site of religious observance, with no indication of any secular purpose for almost three decades. *Id.* at 1125.

But here, the Memorial has always served as a war memorial, has been adorned with secular elements for its entire history, and sits among other memorials in Veterans Memorial Park. The Memorial's predominant use has been for Veterans Day and Memorial Day celebrations, although three religious services were conducted at the Memorial nearly ninety years ago. Also, the invocations and benedictions performed at the annual veterans celebrations are not enough to cause a reasonable observer to perceive the Memorial as an endorsement of Christianity in light of its overwhelmingly secular history and context. Further, guidance from *Van Orden* provides that the Memorial's ninety-year existence and fifty-year government ownership without litigation is a strong indication that the reasonable observer perceived its secular message. *See* 545 U.S. at 702–03 (stating that challenged monument's presence on government property for forty years provided determinative factor that it conveyed predominately secular message). The Memorial stands at a busy intersection, yet this case is the first time the Memorial has been challenged as unconstitutional. Those fifty years strongly suggest "that few individuals, whatever their system of beliefs, are likely to have understood the [Memorial] as amounting, in any significantly detrimental way, to a government effort . . . primarily to promote religion over nonreligion," or to "engage in," "compel," or deter any religious practice or beliefs. *Id.* at 702 (quoting *Schempp*, 374 U.S. at 305 (Goldberg, J., concurring)); *see also Buono*, 559 U.S. at 716 ("Time also has played its role. [After] nearly seven decades[,] . . . the cross and the cause it commemorated had become entwined in the public consciousness."). This significant passage of time must

45

factor into the Court's analysis and "help[] us understand that as a practical matter of *degree* [the Memorial] is unlikely to prove divisive." *Van Orden*, 545 U.S. at 702.

With the foregoing facts, circumstances, and principles in mind, I conclude that a reasonable observer would understand that the Memorial, while displaying a religious symbol, is a war memorial built to celebrate the forty-nine Prince George's County residents who gave their lives in battle. Such an observer would not understand the effect of the Commission's display of the Memorial—with such a commemorative past and set among other memorials in a large state park—to be a divisive message promoting Christianity over any other religion or nonreligion. A cross near a busy intersection "need not be taken as a statement of governmental support for sectarian beliefs. The Constitution does not oblige government to avoid any public acknowledgment of religion's role in society. Rather, it leaves room to accommodate divergent values within a constitutionally permissible framework." *Buono*, 559 U.S. at 718–19 (citations omitted). We must be careful not to push the Establishment Clause beyond its purpose in search of complete neutrality. "[U]ntutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands," but of extreme commitment to the secular, "or even active, hostility to the religious." *Van Orden*, 545 U.S. at 699 (quoting *Schempp*, 374 U.S. at 306 (Goldberg, J., concurring)). Finding that a reasonable observer would perceive the Memorial as an endorsement of Christianity would require that we pursue a level of neutrality beyond our constitutional mandate. I therefore conclude that the Memorial does not violate the second factor of the *Lemon* test.

46

B.

The *Lemon* test's final factor asks whether the challenged display has created an "excessive entanglement" between government and religion. *Lambeth*, 407 F.3d at 272–73. "The kind of excessive entanglement of government and religion precluded by *Lemon* is characterized by 'comprehensive, discriminating, and continuing state surveillance.'" *Id.* at 273 (quoting *Lemon,* 403 U.S. at 619). This inquiry is one of "kind and degree," *Lynch*, 465 U.S. at 684, "and because some interaction between church and state is inevitable, the Supreme Court has reaffirmed that the '[e]ntanglement must be "excessive" before it runs afoul of the Establishment Clause,'" *Koenick v. Felton*, 190 F.3d 259, 268 (4th Cir. 1999) (quoting *Agostini v. Felton*, 521 U.S. 203, 233 (1997)).

The majority concludes that the Memorial fosters excessive entanglement because of the Commission's ownership and maintenance of the Memorial. But the Commission's maintenance of the Memorial and the land surrounding it could hardly be considered the sort of state surveillance that *Lemon* intends to prohibit. *See Lemon*, 403 U.S. at 615–20 (concluding that challenged action excessively entangled state with religion by requiring state to supplement salaries for teachers in parochial schools); *see also Mellen,* 327 F.3d at 375 (determining that public university's supper prayer violated *Lemon*'s third prong because school officials "composed, mandated, and monitored a daily prayer"). Rather, the Commission is merely maintaining a monument within a state park and a median in between intersecting highways that must be well lit for public safety reasons. There is no evidence that the Commission consults with any churches or religious organizations to determine who may access the Memorial for events. Nor is

47

there evidence that the Commission is required to be involved in any church-related activities to maintain the Memorial.

Further, the majority observes that "*any* use of public funds to promote religious doctrines violates the Establishment Clause." *Bowen v. Kendrick*, 487 U.S. 589, 623 (1988) (O'Connor, J., concurring). But, in *Agostini*, the Supreme Court held that a federally funded program that paid public school teachers to teach disadvantaged children in parochial schools did not cause an *excessive* entanglement between church and state. 521 U.S. at 234–35. Likewise, the Commission's use of $122,000 over the course of fifty-plus years for lighting and upkeep is not a promotion of any religious doctrine, as the Memorial is a historical monument honoring veterans.

I therefore conclude that the Memorial does not violate the third factor of the *Lemon* test.

\* \* \*

This Memorial stands in witness to the VALOR, ENDURANCE, COURAGE, and DEVOTION of the forty-nine residents of Prince George's County, Maryland "who lost their lives in the Great War for the liberty of the world." I cannot agree that a monument so conceived and dedicated and that bears such witness violates the letter or spirit of the very Constitution these heroes died to defend. Accordingly, I would affirm the district court's judgment.