Justice KAVANAUGH, concurring.
*2092 I join the Court's eloquent and persuasive opinion in full. I write separately to emphasize two points.
I
Consistent with the Court's case law, the Court today applies a history and tradition test in examining and upholding the constitutionality of the Bladensburg Cross. See Marsh v. Chambers , 463 U.S. 783, 787-792, 795, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) ; Van Orden v. Perry , 545 U.S. 677, 686-690, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (plurality opinion); Town of Greece v. Galloway , 572 U.S. 565, 575-578, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014).
As this case again demonstrates, this Court no longer applies the old test articulated in Lemon v. Kurtzman, 403 U. S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Lemon test examined, among other things, whether the challenged government action had a primary effect of advancing or endorsing religion. If Lemon guided this Court's understanding of the Establishment Clause, then many of the Court's Establishment Clause cases over the last 48 years would have been decided differently, as I will explain.
The opinion identifies five relevant categories of Establishment Clause cases: (1) religious symbols on government property and religious speech at government events; (2) religious accommodations and exemptions from generally applicable laws; (3) government benefits and tax exemptions for religious organizations; (4) religious expression in public schools; and (5) regulation of private religious speech in public forums. See ante , at 2081 - 2082, n. 16.
The Lemon test does not explain the Court's decisions in any of those five categories.
In the first category of cases, the Court has relied on history and tradition and upheld various religious symbols on government property and religious speech at government events. See, e.g ., Marsh , 463 U.S. at 787-792, 795, 103 S.Ct. 3330 ; Van Orden , 545 U.S. at 686-690, 125 S.Ct. 2854 (plurality opinion); Town of Greece , 572 U.S. at 575-578, 134 S.Ct. 1811. The Court does so again today. Lemon does not account for the results in these cases.
In the second category of cases, this Court has allowed legislative accommodations for religious activity and upheld legislatively granted religious exemptions from generally applicable laws. See, e.g ., Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos , 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) ; Cutter v. Wilkinson , 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). But accommodations and exemptions "by definition" have the effect of advancing or endorsing religion to some extent. Amos , 483 U.S. at 347, 107 S.Ct. 2862 (O'Connor, J., concurring in judgment) (quotation altered). Lemon , fairly applied, does not justify those decisions.
In the third category of cases, the Court likewise has upheld government benefits and tax exemptions that go to religious organizations, even though those policies have the effect of advancing or endorsing religion. See, e.g ., Walz v. Tax Comm'n of City of New York , 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ; Mueller v. Allen , 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) ; Mitchell v. Helms , 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion); Zelman v. Simmons-Harris , 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) ;
*2093 Trinity Lutheran Church of Columbia, Inc . v. Comer , 582 U. S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017). Those outcomes are not easily reconciled with Lemon .
In the fourth category of cases, the Court has proscribed government-sponsored prayer in public schools. The Court has done so not because of Lemon , but because the Court concluded that government-sponsored prayer in public schools posed a risk of coercion of students. The Court's most prominent modern case on that subject, Lee v. Weisman , 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), did not rely on Lemon . In short, Lemon was not necessary to the Court's decisions holding government-sponsored school prayers unconstitutional.
In the fifth category, the Court has allowed private religious speech in public forums on an equal basis with secular speech. See, e.g ., Lamb's Chapel v. Center Moriches Union Free School Dist ., 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) ; Capitol Square Review and Advisory Bd. v. Pinette , 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) ; Rosenberger v. Rector and Visitors of Univ. of Va. , 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ; Good News Club v. Milford Central School , 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). That practice does not violate the Establishment Clause, the Court has ruled. Lemon does not explain those cases.
Today, the Court declines to apply Lemon in a case in the religious symbols and religious speech category, just as the Court declined to apply Lemon in Town of Greece v. Galloway , Van Orden v. Perry , and Marsh v. Chambers . The Court's decision in this case again makes clear that the Lemon test does not apply to Establishment Clause cases in that category. And the Court's decisions over the span of several decades demonstrate that the Lemon test is not good law and does not apply to Establishment Clause cases in any of the five categories.
On the contrary, each category of Establishment Clause cases has its own principles based on history, tradition, and precedent. And the cases together lead to an overarching set of principles: If the challenged government practice is not coercive and if it (i) is rooted in history and tradition; or (ii) treats religious people, organizations, speech, or activity equally to comparable secular people, organizations, speech, or activity; or (iii) represents a permissible legislative accommodation or exemption from a generally applicable law, then there ordinarily is no Establishment Clause violation.*
The practice of displaying religious memorials, particularly religious war memorials, on public land is not coercive and is rooted in history and tradition. The Bladensburg Cross does not violate the Establishment Clause. Cf. Town of Greece , 572 U.S. 565, 134 S.Ct. 1811, 188 L.Ed.2d 835.
II
The Bladensburg Cross commemorates soldiers who gave their lives for America in World War I. I agree with the Court that the Bladensburg Cross is constitutional. At the same time, I have deep respect for the plaintiffs' sincere objections to seeing the cross on public land. I have great respect for the Jewish war veterans who in an amicus brief say that the cross on public land sends a message of exclusion. I recognize their sense of distress and alienation. Moreover, I fully understand the deeply religious nature of the cross. It *2094 would demean both believers and nonbelievers to say that the cross is not religious, or not all that religious. A case like this is difficult because it represents a clash of genuine and important interests. Applying our precedents, we uphold the constitutionality of the cross. In doing so, it is appropriate to also restate this bedrock constitutional principle: All citizens are equally American, no matter what religion they are, or if they have no religion at all.
The conclusion that the cross does not violate the Establishment Clause does not necessarily mean that those who object to it have no other recourse. The Court's ruling allows the State to maintain the cross on public land. The Court's ruling does not require the State to maintain the cross on public land. The Maryland Legislature could enact new laws requiring removal of the cross or transfer of the land. The Maryland Governor or other state or local executive officers may have authority to do so under current Maryland law. And if not, the legislature could enact new laws to authorize such executive action. The Maryland Constitution, as interpreted by the Maryland Court of Appeals, may speak to this question. And if not, the people of Maryland can amend the State Constitution.
Those alternative avenues of relief illustrate a fundamental feature of our constitutional structure: This Court is not the only guardian of individual rights in America. This Court fiercely protects the individual rights secured by the U. S. Constitution. See, e.g ., West Virginia Bd. of Ed. v. Barnette , 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ; Wisconsin v. Yoder , 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). But the Constitution sets a floor for the protection of individual rights. The constitutional floor is sturdy and often high, but it is a floor. Other federal, state, and local government entities generally possess authority to safeguard individual rights above and beyond the rights secured by the U. S. Constitution. See generally J. Sutton, 51 Imperfect Solutions (2018); Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).
Justice KAGAN, concurring in part.
I fully agree with the Court's reasons for allowing the Bladensburg Peace Cross to remain as it is, and so join Parts I, II-B, II-C, III, and IV of its opinion, as well as Justice BREYER's concurrence. Although I agree that rigid application of the Lemon test does not solve every Establishment Clause problem, I think that test's focus on purposes and effects is crucial in evaluating government action in this sphere-as this very suit shows. I therefore do not join Part II-A. I do not join Part II-D out of perhaps an excess of caution. Although I too "look[ ] to history for guidance," ante, at 2087 (plurality opinion), I prefer at least for now to do so case-by-case, rather than to sign on to any broader statements about history's role in Establishment Clause analysis. But I find much to admire in this section of the opinion-particularly, its emphasis on whether longstanding monuments, symbols, and practices reflect "respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans." Ante, at 2089. Here, as elsewhere, the opinion shows sensitivity to and respect for this Nation's pluralism, and the values of neutrality and inclusion that the First Amendment demands.
Justice THOMAS, concurring in the judgment.
The Establishment Clause states that "Congress shall make no law respecting *2095 an establishment of religion." U. S. Const., Amdt. 1. The text and history of this Clause suggest that it should not be incorporated against the States. Even if the Clause expresses an individual right enforceable against the States, it is limited by its text to "law[s]" enacted by a legislature, so it is unclear whether the Bladensburg Cross would implicate any incorporated right. And even if it did, this religious display does not involve the type of actual legal coercion that was a hallmark of historical establishments of religion. Therefore, the Cross is clearly constitutional.
I
As I have explained elsewhere, the Establishment Clause resists incorporation against the States. Town of Greece v. Galloway , 572 U.S. 565, 604-607, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014) (opinion concurring in part and concurring in judgment); Elk Grove Unified School Dist. v. Newdow , 542 U.S. 1, 49-51, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (opinion concurring in judgment); Van Orden v. Perry , 545 U.S. 677, 692-693, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (concurring opinion); Zelman v. Simmons-Harris , 536 U.S. 639, 677-680, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (same). In Everson v. Board of Ed. of Ewing , 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court "casually" incorporated the Clause with a declaration that because the Free Exercise Clause had been incorporated, " '[t]here is every reason to give the same application and broad interpretation to the "establishment of religion" clause.' " Town of Greece , 572 U.S. at 607, n. 1, 134 S.Ct. 1811 (opinion of THOMAS, J.). The Court apparently did not consider that an incorporated Establishment Clause would prohibit exactly what the text of the Clause seeks to protect: state establishments of religion. See id. , at 605-606, 134 S.Ct. 1811.
The Court's "inattention" to the significant question of incorporation "might be explained, although not excused, by the rise of popular conceptions about 'separation of church and state' as an 'American' constitutional right." Id., at 608, n. 1, 134 S.Ct. 1811 ; see P. Hamburger, Separation of Church and State 454-463 (2002); see also id. , at 391-454, 113 S.Ct. 2141 (tracing the role of nativist sentiment in the rise of "the modern myth of separation" as an American ideal). But an ahistorical generalization is no substitute for careful constitutional analysis. We should consider whether any longstanding right of citizenship restrains the States in the establishment context. See generally McDonald v. Chicago , 561 U.S. 742, 805-858, and n. 20, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment).
Further confounding the incorporation question is the fact that the First Amendment by its terms applies only to "law[s]" enacted by "Congress." Obviously, a memorial is not a law. And respondents have not identified any specific law they challenge as unconstitutional, either on its face or as applied. Thus, respondents could prevail on their establishment claim only if the prohibition embodied in the Establishment Clause was understood to be an individual right of citizenship that applied to more than just "law[s]" "ma[de]" by "Congress."[1]
*2096 II
Even if the Clause applied to state and local governments in some fashion, "[t]he mere presence of the monument along [respondents'] path involves no coercion and thus does not violate the Establishment Clause." Van Orden , 545 U.S. at 694, 125 S.Ct. 2854 (opinion of THOMAS, J.). The sine qua non of an establishment of religion is " 'actual legal coercion.' " Id., at 693, 125 S.Ct. 2854. At the founding, "[t]he coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and threat of penalty." Lee v. Weisman , 505 U.S. 577, 640, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting) (emphasis deleted). "In a typical case, attendance at the established church was mandatory, and taxes were levied to generate church revenue. Dissenting ministers were barred from preaching, and political participation was limited to members of the established church." Town of Greece , supra , at 608, 134 S.Ct. 1811 (opinion of THOMAS, J.) (citation omitted). In an action claiming an unconstitutional establishment of religion, the plaintiff must demonstrate that he was actually coerced by government conduct that shares the characteristics of an establishment as understood at the founding.[2]
Here, respondents briefly suggest that the government's spending their tax dollars on maintaining the Bladensburg Cross represents coercion, but they have not demonstrated that maintaining a religious display on public property shares any of the historical characteristics of an establishment of religion. The local commission has not attempted to control religious doctrine or personnel, compel religious observance, single out a particular religious denomination for exclusive state subsidization, or punish dissenting worship. Instead, the commission has done something that the founding generation, as well as the generation that ratified the Fourteenth Amendment, would have found commonplace: displaying a religious symbol on government property. See Brief for Becket Fund for Religious Liberty as Amicus Curiae 14-22. Lacking any characteristics of "the coercive state establishments that existed at the founding," Town of Greece , 572 U.S. at 608, 134 S.Ct. 1811 (opinion of THOMAS, J.), the Bladensburg Cross is constitutional.
The Bladensburg Cross is constitutional even though the cross has religious significance as a central symbol of Christianity. Respondents' primary contention is that this characteristic of the Cross makes it "sectarian"-a word used in respondents' brief more than 40 times. Putting aside the fact that Christianity is not a "sect," religious displays or speech need not be limited to that which a "judge considers to be nonsectarian." Id ., at 582, 134 S.Ct. 1811 (majority opinion). As the Court has explained, "[a]n insistence on nonsectarian" religious speech is inconsistent with our Nation's history and traditions. Id., at 578-580, 134 S.Ct. 1811 ; see id., at 595, 134 S.Ct. 1811 (ALITO, J., concurring). Moreover, requiring that religious expressions be nonsectarian would force the courts "to act as supervisors and censors of religious speech." Id., at 581, 134 S.Ct. 1811 (majority opinion). Any such effort would find courts "trolling through ... religious beliefs"
*2097 to decide what speech is sufficiently generic. Mitchell v. Helms , 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion). And government bodies trying to comply with the inevitably arbitrary decisions of the courts would face similarly intractable questions. See Town of Greece , supra, at 596, 134 S.Ct. 1811 (opinion of ALITO, J.).[3]
III
As to the long-discredited test set forth in Lemon v. Kurtzman , 403 U.S. 602, 612-613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and reiterated in County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter , 492 U.S. 573, 592-594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the plurality rightly rejects its relevance to claims, like this one, involving "religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies." Ante, at 2081 - 2082, and n. 16. I agree with that aspect of its opinion. I would take the logical next step and overrule the Lemon test in all contexts. First, that test has no basis in the original meaning of the Constitution. Second, "since its inception," it has "been manipulated to fit whatever result the Court aimed to achieve." McCreary County v. American Civil Liberties Union of Ky. , 545 U.S. 844, 900, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (Scalia, J., dissenting); see Lamb's Chapel v. Center Moriches Union Free School Dist. , 508 U.S. 384, 398-399, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring in judgment). Third, it continues to cause enormous confusion in the States and the lower courts. See generally *2098 Utah Highway Patrol Assn. v. American Atheists, Inc. , 565 U.S. 994, 132 S.Ct. 12, 181 L.Ed.2d 379 (2011) (THOMAS, J., dissenting from denial of certiorari). In recent decades, the Court has tellingly refused to apply Lemon in the very cases where it purports to be most useful. See Utah Highway , supra , at 997-998, 132 S.Ct. 12 (collecting cases); ante, at 2080 - 2081 (plurality opinion) (same). The obvious explanation is that Lemon does not provide a sound basis for judging Establishment Clause claims. However, the court below "s[aw] fit to apply Lemon ." 874 F.3d 195, 205 (C.A.4 2017). It is our job to say what the law is, and because the Lemon test is not good law, we ought to say so.
* * *
Regrettably, I cannot join the Court's opinion because it does not adequately clarify the appropriate standard for Establishment Clause cases. Therefore, I concur only in the judgment.
Justice GORSUCH, with whom Justice THOMAS joins, concurring in the judgment.
The American Humanist Association wants a federal court to order the destruction of a 94 year-old war memorial because its members are offended. Today, the Court explains that the plaintiffs are not entitled to demand the destruction of longstanding monuments, and I find much of its opinion compelling. In my judgment, however, it follows from the Court's analysis that suits like this one should be dismissed for lack of standing. Accordingly, while I concur in the judgment to reverse and remand the court of appeals' decision, I would do so with additional instructions to dismiss the case.
*
The Association claims that its members "regularly" come into "unwelcome direct contact" with a World War I memorial cross in Bladensburg, Maryland "while driving in the area." 874 F.3d 195, 203 (C.A.4 2017). And this, the Association suggests, is enough to allow it to insist on a federal judicial decree ordering the memorial's removal. Maybe, the Association concedes, others who are less offended lack standing to sue. Maybe others still who are equally affected but who come into contact with the memorial too infrequently lack standing as well. See Tr. of Oral Arg. 48-49. But, the Association assures us, its members are offended enough-and with sufficient frequency-that they may sue.
This "offended observer" theory of standing has no basis in law. Federal courts may decide only those cases and controversies that the Constitution and Congress have authorized them to hear. And to establish standing to sue consistent with the Constitution, a plaintiff must show: (1) injury-in-fact, (2) causation, and (3) redressability. The injury-in-fact test requires a plaintiff to prove "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted).
Unsurprisingly, this Court has already rejected the notion that offense alone qualifies as a "concrete and particularized" injury sufficient to confer standing. We could hardly have been clearer: "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." Diamond v. Charles , 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). Imagine if a bystander disturbed by a police stop tried to sue under the Fourth Amendment. Suppose an advocacy organization whose members were distressed by a State's decision to deny someone else a civil jury trial sought to complain under the Seventh *2099 Amendment. Or envision a religious group upset about the application of the death penalty trying to sue to stop it. Does anyone doubt those cases would be rapidly dispatched for lack of standing? Cf. Whitmore v. Arkansas , 495 U.S. 149, 151, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (holding that a third party does not have "standing to challenge the validity of a death sentence imposed on a capital defendant who has elected to forgo his right of appeal").
It's not hard to see why this Court has refused suits like these. If individuals and groups could invoke the authority of a federal court to forbid what they dislike for no more reason than they dislike it, we would risk exceeding the judiciary's limited constitutional mandate and infringing on powers committed to other branches of government. Courts would start to look more like legislatures, responding to social pressures rather than remedying concrete harms, in the process supplanting the right of the people and their elected representatives to govern themselves. See, e.g. , Clapper v. Amnesty Int'l USA , 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches"); Warth v. Seldin , 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (without standing requirements "courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions"); Hein v. Freedom From Religion Foundation, Inc. , 551 U.S. 587, 635-636, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (Scalia, J., concurring in judgment) (" 'To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing "government by injunction" ' ").
Proceeding on these principles, this Court has held offense alone insufficient to convey standing in analogous-and arguably more sympathetic-circumstances. Take Allen v. Wright , 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), where the parents of African-American schoolchildren sued to compel the Internal Revenue Service to deny tax-exempt status to schools that discriminated on the basis of race. The parents claimed that their children suffered a "stigmatic injury, or denigration" when the government supported racially discriminatory institutions. Id. , at 754, 104 S.Ct. 3315. But this Court refused to entertain the case, reasoning that standing extends "only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." Id. , at 755, 104 S.Ct. 3315 (internal quotation marks omitted). Now put the teachings there alongside the Association's standing theory here and you get this utterly unjustifiable result: An African-American offended by a Confederate flag atop a state capitol would lack standing to sue under the Equal Protection Clause, but an atheist who is offended by the cross on the same flag could sue under the Establishment Clause. Who really thinks that could be the law? See Brief for Becket Fund for Religious Liberty as Amicus Curiae 34-35.
Consider, as well, the Free Exercise Clause. In Harris v. McRae , 448 U. S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), this Court denied standing to a religious group that raised a free exercise challenge to federal restrictions on abortion funding because "the plaintiffs had 'not contended that the [statute in question] in any way *2100 coerce[d] them as individuals in the practice of their religion.' " Id. , at 321, n. 24, 100 S.Ct. 2671. Instead, the Court has held, a free exercise plaintiff generally must "show that his good-faith religious beliefs are hampered before he acquires standing to attack a statute under the Free-Exercise Clause." Braunfeld v. Brown , 366 U.S. 599, 615, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (Brennan, J., concurring and dissenting). And if standing doctrine has such bite under the Free Exercise Clause, it's difficult to see how it could be as toothless as plaintiffs suppose under the neighboring Establishment Clause.
In fact, this Court has already expressly rejected "offended observer" standing under the Establishment Clause itself. In Valley Forge Christian College v. Americans United for Separation of Church and State, Inc. , 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the plaintiffs objected to a transfer of property from the federal government to a religious college, an action they had learned about through a news release. This Court had little trouble concluding that the plaintiffs lacked standing to challenge the transfer, explaining that "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not an injury-in-fact "sufficient to confer standing under Art. III." Id. , at 485, 102 S.Ct. 752. To be sure, this Court has sometimes resolved Establishment Clause challenges to religious displays on the merits without first addressing standing. But as this Court has held, its own failure to consider standing cannot be mistaken as an endorsement of it: "[D]rive-by jurisdictional rulings of this sort" carry "no precedential effect." Steel Co. v. Citizens for Better Environment , 523 U.S. 83, 91, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).
Offended observer standing is deeply inconsistent, too, with many other longstanding principles and precedents. For example, this Court has consistently ruled that " 'generalized grievances' about the conduct of Government" are insufficient to confer standing to sue. Schlesinger v. Reservists Comm. to Stop the War , 418 U.S. 208, 217, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). But if offended observers could bring suit, this rule would be rendered meaningless: Who, after all, would have trouble recasting a generalized grievance about governmental action into an "I-take-offense" argument for standing? Similarly, this Court has long "adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " Kowalski v. Tesmer , 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). We depart from this rule only where the party seeking to invoke the judicial power "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." Id. , at 130, 125 S.Ct. 564. Applying these principles in Kowalski , this Court held that attorneys lacked standing to assert the rights of indigent defendants. Id. , at 127, 125 S.Ct. 564. And in Whitmore , we rejected a third party's effort to appeal another person's death sentence. 495 U.S. at 151, 110 S.Ct. 1717. But if offended observers could sue, the attorneys in Kowalski might have simply claimed they were "offended" by Michigan's procedure for appointing appellate counsel, and the third party in Whitmore could have just said he was offended (as he surely was) by the impending execution. None of this Court's limits on third-party standing would really matter.
*
Offended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III.
*2101 Not even today's dissent seriously attempts to defend it. So at this point you might wonder: How did the lower courts in this case indulge the plaintiffs' "offended observer" theory of standing? And why have other lower courts done similarly in other cases?
The truth is, the fault lies here. Lower courts invented offended observer standing for Establishment Clause cases in the 1970s in response to this Court's decision in Lemon v. Kurtzman , 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Lemon held that whether governmental action violates the Establishment Clause depends on its (1) purpose, (2) effect, and (3) potential to " 'excessive[ly] ... entangl[e]' " church and state, id. , at 613, 91 S.Ct. 2105, a standard this Court came to understand as prohibiting the government from doing anything that a " 'reasonable observer' " might perceive as "endorsing" religion, County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter , 492 U.S. 573, 620-621, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (opinion of Blackmun, J.); id. , at 631, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in judgment). And lower courts reasoned that, if the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion, then such an observer must be able to sue. Moore v. Bryant , 853 F.3d 245, 250 (C.A.5 2017). Here alone, lower courts concluded, though never with this Court's approval, an observer's offense must "suffice to make an Establishment Clause claim justiciable." Suhre v. Haywood Cty. , 131 F.3d 1083, 1086 (C.A.4 1997).
As today's plurality rightly indicates in Part II-A, however, Lemon was a misadventure. It sought a "grand unified theory" of the Establishment Clause but left us only a mess. See ante , at 2086 - 2087 (plurality opinion). How much "purpose" to promote religion is too much (are Sunday closing laws that bear multiple purposes, religious and secular, problematic)? How much "effect" of advancing religion is tolerable (are even incidental effects disallowed)? What does the "entanglement" test add to these inquiries? Even beyond all that, how "reasonable" must our "reasonable observer" be, and what exactly qualifies as impermissible "endorsement" of religion in a country where "In God We Trust" appears on the coinage, the eye of God appears in its Great Seal, and we celebrate Thanksgiving as a national holiday ("to Whom are thanks being given")? Harris v. Zion , 927 F.2d 1401, 1423 (C.A.7 1991) (Easterbrook, J., dissenting). Nearly half a century after Lemon and, the truth is, no one has any idea about the answers to these questions. As the plurality documents, our "doctrine [is] in such chaos" that lower courts have been "free to reach almost any result in almost any case." McConnell, Religious Participation in Public Programs: Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 119 (1992). Scores of judges have pleaded with us to retire Lemon , scholars of all stripes have criticized the doctrine, and a majority of this Court has long done the same. Ante , at 2081 (plurality opinion). Today, not a single Member of the Court even tries to defend Lemon against these criticisms-and they don't because they can't. As Justice Kennedy explained, Lemon is "flawed in its fundamentals," has proved "unworkable in practice," and is "inconsistent with our history and our precedents." County of Allegheny , 492 U.S. at 655, 669, 109 S.Ct. 3086 (opinion concurring in judgment in part and dissenting in part).
In place of Lemon , Part II-D of the plurality opinion relies on a more modest, historically sensitive approach, recognizing that "the Establishment Clause must be interpreted by reference to historical practices and understandings." Ante , at 2087 *2102 (quoting Town of Greece v. Galloway , 572 U.S. 565, 576, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014) (internal quotation marks omitted)); see also ante , at 2092 - 2094 (KAVANAUGH, J., concurring). So, by way of example, the plurality explains that a state legislature may permissibly begin each session with a prayer by an official chaplain because "Congress for more than 200 years had opened its sessions with a prayer and ... many state legislatures had followed suit." Ante , at 2087 (discussing Marsh v. Chambers , 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and Town of Greece , 572 U.S. 565, 134 S.Ct. 1811, 188 L.Ed.2d 835 ). The constitutionality of a practice doesn't depend on some artificial and indeterminate three-part test; what matters, the plurality reminds us, is whether the challenged practice fits " 'within the tradition' " of this country. Ante , at 2088 (citing Town of Greece , 572 U.S. at 577, 134 S.Ct. 1811 ).
I agree with all this and don't doubt that the monument before us is constitutional in light of the nation's traditions. But then the plurality continues on to suggest that "longstanding monuments, symbols, and practices" are "presumpt[ively]" constitutional. Ante , at 2082. And about that, it's hard not to wonder: How old must a monument, symbol, or practice be to qualify for this new presumption? It seems 94 years is enough, but what about the Star of David monument erected in South Carolina in 2001 to commemorate victims of the Holocaust, or the cross that marines in California placed in 2004 to honor their comrades who fell during the War on Terror? And where exactly in the Constitution does this presumption come from? The plurality does not say, nor does it even explain what work its presumption does. To the contrary, the plurality proceeds to analyze the "presumptively" constitutional memorial in this case for its consistency with " 'historical practices and understandings' " under Marsh and Town of Greece -exactly the same approach that the plurality, quoting Town of Greece , recognizes " 'must be' " used whenever we interpret the Establishment Clause. Ante , at 2087; see also ante , at 2092 - 2094 (KAVANAUGH, J., concurring). Though the plurality does not say so in as many words, the message for our lower court colleagues seems unmistakable: Whether a monument, symbol, or practice is old or new, apply Town of Greece , not Lemon . Indeed, some of our colleagues recognize this implication and blanch at its prospect. See ante , at 2091 (BREYER, J., concurring); ante , at 2094 (KAGAN, J., concurring in part) (declining to join Parts II-A & II-D); post , at 2104, n. 2 (GINSBURG, J., dissenting). But if that's the real message of the plurality's opinion, it seems to me exactly right-because what matters when it comes to assessing a monument, symbol, or practice isn't its age but its compliance with ageless principles. The Constitution's meaning is fixed, not some good-for-this-day-only coupon, and a practice consistent with our nation's traditions is just as permissible whether undertaken today or 94 years ago.
*
With Lemon now shelved, little excuse will remain for the anomaly of offended observer standing, and the gaping hole it tore in standing doctrine in the courts of appeals should now begin to close. Nor does this development mean colorable Establishment Clause violations will lack for proper plaintiffs. By way of example only, a public school student compelled to recite a prayer will still have standing to sue. See School Dist. of Abington Township v. Schempp , 374 U.S. 203, 224, n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). So will persons denied public office because of their religious affiliations or lack of them. And *2103 so will those who are denied government benefits because they do not practice a favored religion or any at all. Texas Monthly, Inc. v. Bullock , 489 U.S. 1, 7-8, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality opinion). On top of all that, States remain free to supply other forms of relief consistent with their own laws and constitutions.
Abandoning offended observer standing will mean only a return to the usual demands of Article III, requiring a real controversy with real impact on real persons to make a federal case out of it. Along the way, this will bring with it the welcome side effect of rescuing the federal judiciary from the sordid business of having to pass aesthetic judgment, one by one, on every public display in this country for its perceived capacity to give offense. It's a business that has consumed volumes of the federal reports, invited erratic results, frustrated generations of judges, and fomented "the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." Van Orden v. Perry , 545 U.S. 677, 704, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (BREYER, J., concurring in judgment). Courts applying Lemon 's test have upheld Ten Commandment displays and demanded their removal; they have allowed memorial crosses and insisted that they be razed; they have permitted Christmas displays and pulled the plug on them; and they have pondered seemingly endlessly the inclusion of "In God We Trust" on currency or similar language in our Pledge of Allegiance. No one can predict the rulings-but one thing is certain: Between the challenged practices and the judicial decisions, just about everyone will wind up offended.
Nor have we yet come close to exhausting the potential sources of offense and federal litigation Lemon invited, for what about the display of the Ten Commandments on the frieze in our own courtroom or on the doors leading into it? Or the statues of Moses and the Apostle Paul next door in the Library of Congress? Or the depictions of the Ten Commandments found in the Justice Department and the National Archives? Or the crosses that can be found in the U. S. Capitol building? And all that just takes us mere steps from where we sit. In light of today's decision, we should be done with this business, and our lower court colleagues may dispose of cases like these on a motion to dismiss rather than enmeshing themselves for years in intractable disputes sure to generate more heat than light.
*
In a large and diverse country, offense can be easily found. Really, most every governmental action probably offends somebody . No doubt, too, that offense can be sincere, sometimes well taken, even wise. But recourse for disagreement and offense does not lie in federal litigation. Instead, in a society that holds among its most cherished ambitions mutual respect, tolerance, self-rule, and democratic responsibility, an "offended viewer" may "avert his eyes," Erznoznik v. Jacksonville , 422 U.S. 205, 212, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), or pursue a political solution. Today's decision represents a welcome step toward restoring this Court's recognition of these truths, and I respectfully concur in the judgment.
Justice GINSBURG, with whom Justice SOTOMAYOR joins, dissenting.
An immense Latin cross stands on a traffic island at the center of a busy three-way intersection in Bladensburg, Maryland.[1] "[M]onumental, clear, and bold" by *2104 day, App. 914, the cross looms even larger illuminated against the night-time sky. Known as the Peace Cross, the monument was erected by private citizens in 1925 to honor local soldiers who lost their lives in World War I. "[T]he town's most prominent symbol" was rededicated in 1985 and is now said to honor "the sacrifices made [in] all wars," id., at 868 (internal quotation marks omitted), by "all veterans," id., at 195. Both the Peace Cross and the traffic island are owned and maintained by the Maryland-National Capital Park and Planning Commission (Commission), an agency of the State of Maryland.
Decades ago, this Court recognized that the Establishment Clause of the First Amendment to the Constitution demands governmental neutrality among religious faiths, and between religion and nonreligion. See Everson v. Board of Ed. of Ewing , 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Numerous times since, the Court has reaffirmed the Constitution's commitment to neutrality. Today the Court erodes that neutrality commitment, diminishing precedent designed to preserve individual liberty and civic harmony in favor of a "presumption of constitutionality for longstanding monuments, symbols, and practices." Ante, at 2082 (plurality opinion).[2]
The Latin cross is the foremost symbol of the Christian faith, embodying the "central theological claim of Christianity: that the son of God died on the cross, that he rose from the dead, and that his death and resurrection offer the possibility of eternal life." Brief for Baptist Joint Committee for Religious Liberty et al. as Amici Curiae 7 (Brief for Amici Christian and Jewish Organizations). Precisely because the cross symbolizes these sectarian beliefs, it is a common marker for the graves of Christian soldiers. For the same reason, using the cross as a war memorial does not transform it into a secular symbol, as the Courts of Appeals have uniformly recognized. See infra , at 2108 - 2109, n. 10. Just as a Star of David is not suitable to honor Christians who died serving their country, so a cross is not suitable to honor those of other faiths who died defending their nation. Soldiers of all faiths "are united by their love of country, but they are not united by the cross." Brief for Jewish War Veterans of the United States of America, Inc., as Amicus Curiae 3 (Brief for Amicus Jewish War Veterans).
By maintaining the Peace Cross on a public highway, the Commission elevates Christianity over other faiths, and religion over nonreligion. Memorializing the service of American soldiers is an "admirable and unquestionably secular" objective. Van Orden v. Perry , 545 U.S. 677, 715, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Stevens, J., dissenting). But the Commission does not serve that objective by displaying a symbol that bears "a starkly sectarian message."
*2105 Salazar v. Buono , 559 U.S. 700, 736, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010) (Stevens, J., dissenting).
I
A
The First Amendment commands that the government "shall make no law" either "respecting an establishment of religion" or "prohibiting the free exercise thereof." See Everson , 330 U.S. at 15, 67 S.Ct. 504. Adoption of these complementary provisions followed centuries of "turmoil, civil strife, and persecutio[n], generated in large part by established sects determined to maintain their absolute political and religious supremacy." Id ., at 8-9, 67 S.Ct. 504. Mindful of that history, the fledgling Republic ratified the Establishment Clause, in the words of Thomas Jefferson, to "buil[d] a wall of separation between church and state." Draft Reply to the Danbury Baptist Association, in 36 Papers of Thomas Jefferson 254, 255 (B. Oberg ed. 2009) (footnote omitted).
This barrier "protect[s] the integrity of individual conscience in religious matters." McCreary County v. American Civil Liberties Union of Ky. , 545 U.S. 844, 876, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). It guards against the "anguish, hardship and bitter strife," Engel v. Vitale , 370 U.S. 421, 429, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), that can occur when "the government weighs in on one side of religious debate," McCreary County , 545 U.S. at 876, 125 S.Ct. 2722. And while the "union of government and religion tends to destroy government and to degrade religion," separating the two preserves the legitimacy of each. Engel , 370 U.S. at 431, 82 S.Ct. 1261.
The Establishment Clause essentially instructs: "[T]he government may not favor one religion over another, or religion over irreligion." McCreary County , 545 U.S. at 875, 125 S.Ct. 2722. For, as James Madison observed, the government is not "a competent Judge of Religious Truth." Memorial and Remonstrance Against Religious Assessments, 8 Papers of James Madison 295, 301 (R. Rutland, W. Rachal, B. Ripel, & F. Teute eds. 1973) (Memorial and Remonstrance). When the government places its "power, prestige [or] financial support ... behind a particular religious belief," Engel , 370 U.S. at 431, 82 S.Ct. 1261, the government's imprimatur "mak[es] adherence to [that] religion relevant ... to a person's standing in the political community," County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter , 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (internal quotation marks omitted). Correspondingly, "the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." Engel , 370 U.S. at 431, 82 S.Ct. 1261. And by demanding neutrality between religious faith and the absence thereof, the Establishment Clause shores up an individual's "right to select any religious faith or none at all." Wallace v. Jaffree , 472 U.S. 38, 53, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).
B
In cases challenging the government's display of a religious symbol, the Court has tested fidelity to the principle of neutrality by asking whether the display has the "effect of 'endorsing' religion." County of Allegheny , 492 U.S. at 592, 109 S.Ct. 3086. The display fails this requirement if it objectively "convey[s] a message that religion or a particular religious belief is favored or preferred." Id., at 593, 109 S.Ct. 3086 (internal quotation marks omitted; emphasis deleted).[3] To make that determination, *2106 a court must consider "the pertinent facts and circumstances surrounding the symbol and its placement." Buono , 559 U.S. at 721, 130 S.Ct. 1803 (plurality opinion); id., at 750-751, 130 S.Ct. 1803 (Stevens, J., dissenting) (quoting plurality opinion).[4]
As I see it, when a cross is displayed on public property, the government may be presumed to endorse its religious content. The venue is surely associated with the State; the symbol and its meaning are just as surely associated exclusively with Christianity. "It certainly is not common for property owners to open up their property [to] monuments that convey a message with which they do not wish to be associated." Pleasant Grove City v. Summum , 555 U.S. 460, 471, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). To non-Christians, nearly 30% of the population of the United States, Pew Research Center, America's Changing Religious Landscape 4 (2015), the State's choice to display the cross on public buildings or spaces conveys a message of exclusion: It tells them they "are outsiders, not full members of the political community," County of Allegheny , 492 U.S. at 625, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in judgment) (internal quotation marks omitted). Cf. Van Orden , 545 U.S. at 708, 125 S.Ct. 2854 (Stevens, J., dissenting) ("The adornment of our public spaces with displays of religious symbols" risks " 'offend[ing] nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful.' " (quoting County of Allegheny , 492 U.S. at 651, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part))).[5]
A presumption of endorsement, of course, may be overcome. See Buono , 559 U.S. at 718, 130 S.Ct. 1803 (plurality opinion) ("The goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm."). A display does not run afoul of the neutrality principle if its "setting ... plausibly indicates" that the government has not sought "either to adopt [a] religious message or to urge its acceptance by others." Van Orden , 545 U.S. at 737, 125 S.Ct. 2854 (Souter, J., dissenting). The "typical museum setting," for example, *2107 "though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." Lynch v. Donnelly , 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Similarly, when a public school history teacher discusses the Protestant Reformation, the setting makes clear that the teacher's purpose is to educate, not to proselytize. The Peace Cross, however, is not of that genre.
II
A
"For nearly two millennia," the Latin cross has been the "defining symbol" of Christianity, R. Jensen, The Cross: History, Art, and Controversy ix (2017), evoking the foundational claims of that faith. Christianity teaches that Jesus Christ was "a divine Savior" who "illuminate[d] a path toward salvation and redemption." Lynch , 465 U.S. at 708, 104 S.Ct. 1355 (Brennan, J., dissenting). Central to the religion are the beliefs that "the son of God," Jesus Christ, "died on the cross," that "he rose from the dead," and that "his death and resurrection offer the possibility of eternal life." Brief for Amici Christian and Jewish Organizations 7.[6] "From its earliest times," Christianity was known as "religio crucis -the religion of the cross." R. Viladesau, The Beauty of the Cross: The Passion of Christ in Theology and the Arts, From the Catacombs to the Eve of the Renaissance 7 (2006). Christians wear crosses, not as an ecumenical symbol, but to proclaim their adherence to Christianity.
An exclusively Christian symbol, the Latin cross is not emblematic of any other faith. Buono , 559 U.S. at 747, 130 S.Ct. 1803 (Stevens, J., dissenting); Viladesau, supra, at 7 ("[T]he cross and its meaning ... set Christianity apart from other world religions.").[7] The principal symbol of Christianity around the world should not loom over public thoroughfares, suggesting official recognition of that religion's paramountcy.
B
The Commission urges in defense of its monument that the Latin cross "is not merely a reaffirmation of Christian beliefs"; rather, "when used in the context of a war memorial," the cross becomes "a universal symbol of the sacrifices of those who fought and died." Brief for Petitioner Maryland-National Capital Park and Planning Commission 34-35 (Brief for Planning Commission) (internal quotation marks omitted). See also Brief for United States as Amicus Curiae 25 (The Latin cross is "a Christian symbol ... [b]ut it is also 'a symbol often used to honor and respect [soldiers'] heroic acts.' " (quoting Buono , 559 U.S. at 721, 130 S.Ct. 1803 (plurality opinion); some internal quotation marks omitted)).
The Commission's "[a]ttempts to secularize what is unquestionably a sacred [symbol] defy credibility and disserve people of faith." Van Orden , 545 U.S. at 717, 125 S.Ct. 2854 (Stevens, J., dissenting). See, e.g., Brief for Amici Christian and Jewish Organizations 7 ("For Christians who think seriously about the events and *2108 message that the cross represents, [the Commission's] claims are deeply offensive."). The asserted commemorative meaning of the cross rests on-and is inseparable from-its Christian meaning: "the crucifixion of Jesus Christ and the redeeming benefits of his passion and death," specifically, "the salvation of man." American Civil Liberties Union of Illinois v. St. Charles , 794 F.2d 265, 273 (C.A.7 1986) (internal quotation marks omitted).
Because of its sacred meaning, the Latin cross has been used to mark Christian deaths since at least the fourth century. See Jensen, supra, at 68-69. The cross on a grave "says that a Christian is buried here," Brief for Amici Christian and Jewish Organizations 8, and "commemorates [that person's death] by evoking a conception of salvation and eternal life reserved for Christians," Brief for Amicus Jewish War Veterans 7. As a commemorative symbol, the Latin cross simply "makes no sense apart from the crucifixion, the resurrection, and Christianity's promise of eternal life." Brief for Amici Christian and Jewish Organizations 8.[8]
The cross affirms that, thanks to the soldier's embrace of Christianity, he will be rewarded with eternal life. Id., at 8-9. "To say that the cross honors the Christian war dead does not identify a secular meaning of the cross; it merely identifies a common application of the religious meaning." Id., at 8. Scarcely "a universal symbol of sacrifice," the cross is "the symbol of one particular sacrifice." Buono , 559 U.S. at 748, n. 8, 130 S.Ct. 1803 (Stevens, J., dissenting).[9]
Every Court of Appeals to confront the question has held that "[m]aking a ... Latin cross a war memorial does not make the cross secular," it "makes the war memorial sectarian." Id., at 747, 130 S.Ct. 1803.[10] See also *2109 Separation of Church and State Comm. v. Eugene , 93 F.3d 617, 626 (C.A.9 1996) (O'Scannlain, J., concurring in result) ("[T]he City's use of a cross to memorialize the war dead may lead observers to believe that the City has chosen to honor only Christian veterans.").
The Peace Cross is no exception. That was evident from the start. At the dedication ceremony, the keynote speaker analogized the sacrifice of the honored soldiers to that of Jesus Christ, calling the Peace Cross "symbolic of Calvary," App. 449, where Jesus was crucified. Local reporters variously described the monument as "[a] mammoth cross, a likeness of the Cross of Calvary, as described in the Bible," id., at 428; "a monster [C]alvary cross," id., at 431; and "a huge sacrifice cross," id., at 439. The character of the monument has not changed with the passage of time.
C
The Commission nonetheless urges that the Latin cross is a "well-established" secular symbol commemorating, in particular, "military valor and sacrifice [in] World War I." Brief for Planning Commission 21. Calling up images of United States cemeteries overseas showing row upon row of cross-shaped gravemarkers, id., at 4-8; see ante , at 4-5, 21-22; Brief for United States as Amicus Curiae 26, the Commission overlooks this reality: The cross was never perceived as an appropriate headstone or memorial for Jewish soldiers and others who did not adhere to Christianity.
1
A page of history is worth retelling. On November 11, 1918, the Great War ended. Bereaved families of American soldiers killed in the war sought to locate the bodies of their loved ones, and then to decide what to do with their remains. Once a soldier's body was identified, families could choose to have the remains repatriated to the United States or buried overseas in one of several American military cemeteries, yet to be established. Eventually, the remains of 46,000 soldiers were repatriated, and those of 30,000 soldiers were laid to rest in Europe. American Battle Monuments Commission, Annual Report to the President of the United States Fiscal Year 1925, p. 5 (1926) (ABMC Report).
*2110 While overseas cemeteries were under development, the graves of American soldiers in Europe were identified by one of two temporary wooden markers painted white. Christian soldiers were buried beneath the cross; the graves of Jewish soldiers were marked by the Star of David. See L. Budreau, Bodies of War: World War I and the Politics of Commemoration in America, 1919-1933, p. 120 (2010). The remains of soldiers who were neither Christian nor Jewish could be repatriated to the United States for burial under an appropriate headstone.[11]
When the War Department began preparing designs for permanent headstones in 1919, "no topic managed to stir more controversy than the use of religious symbolism." Id., at 121-122. Everyone involved in the dispute, however, saw the Latin cross as a Christian symbol, not as a universal or secular one. To achieve uniformity, the War Department initially recommended replacing the temporary sectarian markers with plain marble slabs resembling "those designed for the national cemeteries in the United States." Van Duyne, Erection of Permanent Headstones in the American Military Cemeteries in Europe, The Quartermaster Review (1930) (Quartermaster Report).
The War Department's recommendation angered prominent civil organizations, including the American Legion and the Gold Star associations: the United States, they urged, ought to retain both the cross and Star of David. See ibid. ; Budreau, supra , at 123. In supporting sectarian markers, these groups were joined by the American Battle Monuments Commission (ABMC), a newly created independent agency charged with supervising the establishment of overseas cemeteries. ABMC Report 57. Congress weighed in by directing the War Department to erect headstones "of such design and material as may be agreed upon by the Secretary of War and the American Battle Monuments Commission." Ibid. (internal quotation marks omitted). In 1924, the War Department approved the ABMC's "designs for a Cross and Star of David." Quartermaster Report; ABMC Report 57.[12]
Throughout the headstone debate, no one doubted that the Latin cross and the Star of David were sectarian gravemarkers, and therefore appropriate only for soldiers who adhered to those faiths. A committee convened by the War Department composed of representatives from "seven prominent war-time organizations" as well as "religious bodies, Protestant, Jewish, [and] Catholic" agreed "unanimous[ly] ... that marble crosses be placed on the graves of all Christian American dead buried abroad, and that the graves of the Jewish American dead be marked by the six-pointed star." Durable Markers in the Form of Crosses for Graves of American Soldiers in Europe, Hearings before the Committee on Military Affairs of the House of Representatives, 68th Cong., 1st Sess., 24 (1924) (emphasis added). The Executive Director of the Jewish Welfare Board stated that "if any religious symbol is erected over the graves, then Judaism should have its symbol over the graves of its dead." Id., at 19. Others expressing *2111 views described the Latin cross as the appropriate symbol to "mar[k] the graves of the Christian heroes of the American forces." Id., at 24 (emphasis added). As stated by the National Catholic War Council, "the sentiment and desires of all Americans, Christians and Jews alike, are one": "They who served us in life should be honored, as they would have wished, in death." Ibid.[13]
Far more crosses than Stars of David, as one would expect, line the grounds of American cemeteries overseas, for Jews composed only 3% of the United States population in 1917. J. Fredman & L. Falk, Jews in American Wars 100 (5th ed. 1954). Jews accounted for nearly 6% of U. S. forces in World War I (in numbers, 250,000), and 3,500 Jewish soldiers died in that war. Ibid. Even in Flanders Field, with its " 'crosses, row on row,' " ante, at 2076 (quoting J. McCrae, In Flanders Fields, In Flanders Fields and Other Poems 3 (G. P. Putnam's Sons ed. 1919)), "Stars of David mark the graves of [eight American soldiers] of Jewish faith," American Battle Monuments Commission, Flanders Field American Cemetery and Memorial Visitor Booklet 11.[14]
2
Reiterating its argument that the Latin cross is a "universal symbol" of World War I sacrifice, the Commission states that "40 World War I monuments ... built in the United States ... bear the shape of a cross." Brief for Planning Commission 8 (citing App. 1130). This figure includes memorials that merely "incorporat[e]" a cross. App. 1130.[15] Moreover, the 40 monuments compose only 4% of the "948 outdoor sculptures commemorating the First World War." Ibid. The Court lists just seven freestanding cross memorials, ante, at 6, n. 10, less than 1% of the total number of monuments to World War I in the United States, see App. 1130. Cross memorials, in short, are outliers. The overwhelming majority of World War I memorials contain no Latin cross.
In fact, the "most popular and enduring memorial of the [post-World War I] decade" was "[t]he mass-produced Spirit of the American Doughboy statue." Budreau, Bodies of War, at 139. That statue, depicting a U. S. infantryman, "met with widespread approval throughout American communities." Ibid. Indeed, the first memorial to World War I erected in Prince George's County "depict[s] a doughboy." App. 110-111. The Peace Cross, as Plaintiffs' expert historian observed, was an "aberration ... even in the era [in which] it was built and dedicated." Id., at 123.
Like cities and towns across the country, the United States military comprehended the importance of "pay[ing] equal respect to all members of the Armed Forces who perished in the service of our country," Buono , 559 U.S. at 759, 130 S.Ct. 1803 (Stevens, J., dissenting), and therefore *2112 avoided incorporating the Latin cross into memorials. The construction of the Tomb of the Unknown Soldier is illustrative. When a proposal to place a cross on the Tomb was advanced, the Jewish Welfare Board objected; no cross appears on the Tomb. See App. 167. In sum, "[t]here is simply 'no evidence ... that the cross has been widely embraced by'-or even applied to-'non-Christians as a secular symbol of death' or of sacrifice in military service" in World War I or otherwise. Trunk v. San Diego , 629 F.3d 1099, 1116 (C.A.9 2011).
D
Holding the Commission's display of the Peace Cross unconstitutional would not, as the Commission fears, "inevitably require the destruction of other cross-shaped memorials throughout the country." Brief for Planning Commission 52. When a religious symbol appears in a public cemetery-on a headstone, or as the headstone itself, or perhaps integrated into a larger memorial-the setting counters the inference that the government seeks "either to adopt the religious message or to urge its acceptance by others." Van Orden , 545 U.S. at 737, 125 S.Ct. 2854 (Souter, J., dissenting). In a cemetery, the "privately selected religious symbols on individual graves are best understood as the private speech of each veteran." Laycock, Government-Sponsored Religious Displays: Transparent Rationalizations and Expedient Post-Modernism, 61 Case W. Res. L. Rev. 1211, 1242 (2011). See also Summum , 555 U.S. at 487, 129 S.Ct. 1125 (Souter, J., concurring in judgment) ("[T]here are circumstances in which government maintenance of monuments does not look like government speech at all. Sectarian identifications on markers in Arlington Cemetery come to mind."). Such displays are "linked to, and sho[w] respect for, the individual honoree's faith and beliefs." Buono , 559 U.S. at 749, n. 8, 130 S.Ct. 1803 (Stevens, J., dissenting). They do not suggest governmental endorsement of those faith and beliefs.[16]
Recognizing that a Latin cross does not belong on a public highway or building does not mean the monument must be "torn down." Ante, at 2091 (BREYER, J., concurring); ante, at 2098 (GORSUCH, J., concurring in judgment).[17] "[L]ike the determination of the violation itself," the "proper remedy ... is necessarily context specific." Buono , 559 U.S. at 755, n. 11, 130 S.Ct. 1803 (Stevens, J., dissenting). In some instances, the violation may be cured by relocating the monument to private land or by transferring ownership of the land and monument to a private party.
* * *
In 1790, President Washington visited Newport, Rhode Island, "a longtime bastion of religious liberty and the home of one of the first communities of American Jews." Town of Greece v. Galloway , 572 U.S. 565, 636, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014) (KAGAN, J., dissenting). In a letter thanking the congregation *2113 for its warm welcome, Washington praised "[t]he citizens of the United States of America" for "giv[ing] to mankind ... a policy worthy of imitation": "All possess alike liberty of conscience and immunities of citizenship." Letter to Newport Hebrew Congregation (Aug. 18, 1790), in 6 Papers of George Washington 284, 285 (D. Twohig ed. 1996). As Washington and his contemporaries were aware, "some of them from bitter personal experience," Engel , 370 U.S. at 429, 82 S.Ct. 1261, religion is "too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate," id., at 432, 82 S.Ct. 1261 (quoting Memorial and Remonstrance). The Establishment Clause, which preserves the integrity of both church and state, guarantees that "however ... individuals worship, they will count as full and equal American citizens." Town of Greece , 572 U.S. at 615, 134 S.Ct. 1811 (KAGAN, J., dissenting). "If the aim of the Establishment Clause is genuinely to uncouple government from church," the Clause does "not permit ... a display of th[e] character" of Bladensburg's Peace Cross. Capitol Square Review and Advisory Bd. v. Pinette , 515 U.S. 753, 817, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (GINSBURG, J., dissenting).
APPENDIX
*2114 *2115 *2116 --------

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co. , 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

That is not to say that challenged government actions outside that safe harbor are unconstitutional. Any such cases must be analyzed under the relevant Establishment Clause principles and precedents.

In my view, the original meaning of the phrase "Congress shall make no law" is a question worth exploring. Compare G. Lawson & G. Seidman, The Constitution of Empire 42 (2004) (arguing that the First Amendment "applies only to Congress"), with Shrum v. Coweta , 449 F.3d 1132, 1140-1143 (C.A.10 2006) (McConnell, J.) (arguing that it is not so limited).

Of course, cases involving state or local action are not strictly speaking Establishment Clause cases, but instead Fourteenth Amendment cases about a privilege or immunity of citizenship. It is conceivable that the salient characteristics of an establishment changed by the time of the Fourteenth Amendment, see Town of Greece v. Galloway , 572 U.S. 565, 607, 609-610, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014) (THOMAS, J., concurring in part and concurring in judgment), but respondents have presented no evidence suggesting so.

Another reason to avoid a constitutional test that turns on the "sectarian" nature of religious speech is that the Court has suggested "formally dispens[ing]" with this factor in related contexts. Mitchell , 530 U.S. at 826, 120 S.Ct. 2530 (plurality opinion). Among other reasons, the "sectarian" test "has a shameful pedigree" that originated during the 1870s when Congress considered the Blaine Amendment, "which would have amended the Constitution to bar any aid to sectarian institutions." Id., at 828, 120 S.Ct. 2530. "Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that 'sectarian' was code for 'Catholic.' " Ibid. This anti-Catholic hostility may well have played a role in the Court's later decisions. Everson v. Board of Ed. of Ewing , 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), for example, was written by Justice Black, who would later accuse Catholics who advocated for textbook loans to religious schools of being "powerful sectarian religious propagandists ... looking toward complete domination and supremacy of their particular brand of religion." Board of Ed. of Central School Dist. No. 1 v. Allen , 392 U.S. 236, 251, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (Black, J., dissenting). Even by the time of Lemon v. Kurtzman , 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), some Justices were still "influenced by residual anti-Catholicism and by a deep suspicion of Catholic schools." Laycock, The Underlying Unity of Separation and Neutrality, 46 Emory L. J. 43, 58 (1997). Indeed, the Court's opinion in Lemon "relied on what it considered to be inherent risks in religious schools despite the absence of a record in Lemon itself and despite contrary fact-finding by the district court in the companion case." Laycock, supra, at 58 (footnote omitted); see generally W. Ball, Mere Creatures of the State?, 35-40 (1994). And in his concurring opinion, Justice Douglas (joined by Justice Black) repeatedly quoted an anti-Catholic book, including for the proposition that, in Catholic parochial schools, " '[t]he whole education of the child is filled with propaganda.' " 403 U.S. at 635, n. 20, 91 S.Ct. 2105 (quoting L. Boettner, Roman Catholicism 360 (1962)); see 403 U.S. at 636, 91 S.Ct. 2105 (similar). The tract said that Hitler, Mussolini, and Stalin learned the "secret[s] of [their] success" in indoctrination from the Catholic Church, and that "an undue proportion of the gangsters, racketeers, thieves, and juvenile delinquents who roam our big city streets come ... from the [Catholic] parochial schools," where children are taught by "brain-washed," " 'ignorant European peasants.' " Boettner, supra, at 363, 370-372.

A photograph of the monument and a map showing its location are reproduced in the Appendix, infra , at 2113 - 2114.

Some of my colleagues suggest that the Court's new presumption extends to all governmental displays and practices, regardless of their age. See ante, at 2092 - 2093 (KAVANAUGH, J., concurring); ante, at 2097 - 2098 (THOMAS, J., concurring in judgment); ante, at 2101 - 2102 (GORSUCH, J., concurring in judgment). But see ante, at 2091 (BREYER, J., joined by KAGAN, J., concurring) (" '[A] more contemporary state effort' to put up a religious display is 'likely to prove divisive in a way that [a] longstanding, pre-existing monument [would] not.' "). I read the Court's opinion to mean what it says: "[R]etaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones," ante, at ----, and, consequently, only "longstanding monuments, symbols, and practices" enjoy "a presumption of constitutionality," id., at ---- (plurality opinion).

Justice GORSUCH's "no standing" opinion is startling in view of the many religious-display cases this Court has resolved on the merits. E.g., McCreary County , 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 ; Van Orden , 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 ; Stone v. Graham , 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam ). And, if Justice GORSUCH is right, three Members of the Court were out of line when they recognized that "[t]he [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall," Buono , 559 U.S. at 715, 130 S.Ct. 1803 (opinion of Kennedy, J., joined by ROBERTS, C.J., and ALITO, J.) (quoting County of Allegheny , 492 U.S. at 661, 109 S.Ct. 3086 (second alteration in original), for no one, according to Justice GORSUCH, should be heard to complain about such a thing. But see Brief for Law Professors as Amici Curiae (explaining why offended observer standing is necessary and proper)).

This inquiry has been described by some Members of the Court as the "reasonable observer" standard. See, e.g. , Capitol Square Review and Advisory Bd. v. Pinette , 515 U.S. 753, 806, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (Stevens, J., dissenting); County of Allegheny , 492 U.S. at 630-631, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in judgment).

See also Jews and Christians Discussion Group in the Central Committee of German Catholics, A Convent and Cross in Auschwitz, in The Continuing Agony: From the Carmelite Convent to the Crosses at Auschwitz 231-232 (A. Berger, H. Cargas, & S. Nowak eds. 2004) ("We Christians must appreciate [that] [t]hroughout history many non-Christians, especially Jews, have experienced the Cross as a symbol of persecution, through the Crusades, the Inquisition and the compulsory baptisms.").

Under "one widespread reading of Christian scriptures," non-Christians are barred from eternal life and, instead, are condemned to hell. Brief for Amici Christian and Jewish Organizations 2. On this reading, the Latin cross symbolizes both the promise of salvation and the threat of damnation by "divid[ing] the world between the saved and the damned." Id., at 12.

Christianity comprises numerous denominations. The term is here used to distinguish Christian sects from religions that do not embrace the defining tenets of Christianity.

The Court sets out familiar uses of the Greek cross, including the Red Cross and the Navy Cross, ante, at 2074 - 20758, 2085 - 2086, and maintains that, today, they carry no religious message. But because the Latin cross has never shed its Christian character, its commemorative meaning is exclusive to Christians. The Court recognizes as much in suggesting that the Peace Cross features the Latin cross for the same reason "why Holocaust memorials invariably include Stars of David": those sectarian "symbols ... signify what death meant for those who are memorialized." Ante , at 2090.

Christian soldiers have drawn parallels between their experiences in war and Jesus's suffering and sacrifice. See, e.g. , C. Dawson, Living Bayonets: A Record of the Last Push 19-20 (1919) (upon finding a crucifix strewn among rubble, a soldier serving in World War I wrote home that Jesus Christ "seem[ed] so like ourselves in His lonely and unhallowed suffering"). This comparison has been portrayed by artists, see, e.g. , 7 Encyclopedia of Religion 4348 (2d ed. 2005) (painter George Rouault's 1926 Miserere series "compares Christ's suffering with twentieth-century experiences of human sufferings in war"), and documented by historians, see, e.g. , R. Schweitzer, The Cross and the Trenches: Religious Faith and Doubt Among British and American Great War Soldiers 28-29 (2003) (given the horrors of trench warfare, "[t]he parallels that soldiers saw between their suffering and Christ's make their identification with Jesus both understandable and revealing"); Lemay, Politics in the Art of War: The American War Cemeteries, 38 Int'l J. Mil. History & Historiography 223, 225 (2018) ("[T]he [cross] grave markers assert the absolute valour and Christ-like heroism of the American dead ....").

See 874 F.3d 195, 207 (C.A.4 2017) (case below) ("Even in the memorial context, a Latin cross serves not ... as a generic symbol of death, but rather a Christian symbol of the death of Jesus Christ."); American Atheists, Inc. v. Davenport , 637 F.3d 1095, 1122 (C.A.10 2010) ("[A] memorial cross is not a generic symbol of death; it is a Christian symbol of death that signifies or memorializes the death of a Christian ."); Trunk v. San Diego , 629 F.3d 1099, 1102 (C.A.9 2011) ("Resurrection of this Cross as a war memorial does not transform it into a secular monument."); Separation of Church and State Comm. v. Eugene , 93 F.3d 617, 619 (C.A.9 1996) (per curiam ) ("[T]he City urges that the cross is no longer a religious symbol but a war memorial. This argument ... fails to withstand Establishment Clause analysis."); Gonzales v. North Twp. of Lake Cty. , 4 F.3d 1412, 1418 (C.A.7 1993) ("[W]e are masters of the obvious, and we know that ... the Latin cross ... is '[the] unmistakable symbol of Christianity as practiced in this country today.' " (quoting Harris v. Zion , 927 F.2d 1401, 1403 (C.A.7 1991) )). See also Jewish War Veterans of the United States v. United States , 695 F.Supp. 3, 11 (D.D.C. 1988) ("[D]efendants are unable to cite a single federal case where a cross such as the one at issue here has survived Establishment Clause scrutiny.").
The Courts of Appeals have similarly concluded that the Latin cross remains a Christian symbol when used for other purposes. See, e.g. , Robinson v. Edmond , 68 F.3d 1226, 1232 (C.A.10 1995) (city seal depicting the cross) ("The religious significance and meaning of the Latin or Christian cross are unmistakable."); Carpenter v. City and County of San Francisco , 93 F.3d 627, 630 (C.A.9 1996) (103-foot cross in public park) ("The Latin cross ... [']represents with relative clarity and simplicity the Christian message of the crucifixion and resurrection of Jesus Christ, a doctrine at the heart of Christianity.' "); American Civil Liberties Union of Ill. v. St. Charles , 794 F.2d 265, 272-273 (C.A.7 1986) (35-foot cross displayed atop a fire house during the Christmas season) ("The cross ... is 'the principal symbol of the Christian religion, recalling the crucifixion of Jesus Christ and the redeeming benefits of his passion and death.' "); Friedman v. Board of Cty. Comm'rs of Bernalillo Cty. , 781 F.2d 777, 782 (C.A.10 1985) (county seal depicting Latin cross) ("[T]he seal ... conveys a strong impression to the average observer that Christianity is being endorsed.").

For unidentified soldiers buried overseas, the American Battle Monuments Commission (ABMC) used the cross and the Star of David markers "in 'proportion of known Jewish dead to know[n] Christians.' " App. 164. The ABMC later decided that "all unidentified graves would be marked with a [c]ross." Id., at 164, n. 21. This change was prompted by "fear [that] a Star of David would be placed over an [u]nknown Christian," not by the belief that the cross had become a universal symbol. Ibid.

A photograph depicting the two headstones is reproduced in the Appendix, infra , at 2115 - 2116.

As noted, supra, at 2109 - 2110, the bodies of soldiers who were neither Christian nor Jewish could be repatriated to the United States and buried in a national cemetery (with a slab headstone), Quartermaster Report, or in a private cemetery (with a headstone of the family's choosing).

Available at https://www.abmc.gov/sites/default/files/publications/FlandersField_Booklet.pdf (all Internet materials as last visited June 18, 2019). For the respective numbers of cross and Star of David headstones, see ABMC, Flanders Field American Cemetery and Memorial Brochure 2, available at https://www.abmc.gov/sites/default/files/publications/Flanders% 20Field_Brochure_Mar2018.pdf.

No other monument in Bladensburg's Veterans Memorial Park displays the Latin cross. For examples of monuments in the Park, see the Appendix, infra , at 2114 - 2116.

As to the Argonne Cross Memorial and the Canadian Cross of Sacrifice in Arlington National Cemetery, visitors to the cemetery "expec[t] to view religious symbols, whether on individual headstones or as standalone monuments." Brief for Amicus Jewish War Veterans 17.

The Court asserts that the Court of Appeals "entertained" the possibility of "amputating the arms of the cross." Ante, at 2086. The appeals court, however, merely reported Plaintiffs' "desired injunctive relief," namely, "removal or demolition of the Cross, or removal of the arms from the Cross 'to form a non-religious slab or obelisk.' " 874 F.3d at 202, n. 7. See also id., at 212, n. 19 (noting that the parties remained "free to explore alternative arrangements that would not offend the Constitution").